WILLIAM KALIPI, Plaintiff-Appellant, *v.* HAWAIIAN TRUST COMPANY, LTD., PEARL M. PETRO, RUTH R. SEARLE, ETHEL F. SHANER, LORRIN A. MEYER, WILLIAM C. MEYER, EDMUND WOND, SAMUEL PEDRO and STATE OF HAWAII, DEPARTMENT OF LAND AND NATURAL RESOURCES and its Director and Chairman of the Board CHRISTOPHER COBB, Defendants-Appellees

NO. 6957

(CIVIL NO. 2808)

December 30, 1982

RICHARDSON, C.J., LUM, NAKAMURA, JJ.,
AND RETIRED JUSTICES OGATA AND MENOR
ASSIGNED TEMPORARILY

2

OPINION OF THE COURT BY RICHARDSON, C.J.

In this appeal, Plaintiff-Appellant Kalipi claims the right to enter Defendants-Appellees' undeveloped lands to gather, without unnecessarily disturbing the surrounding environment, natural products necessary for certain traditional native Hawaiian practices. While we agree that such rights have, to a limited extent, been statutorily preserved, we conclude that Plaintiff's failure to actually reside within the land divisions in which he seeks to exercise these rights requires the affirming of the trial court's judgment for Defendants.

I.

William Kalipi seeks to exercise traditional Hawaiian gathering rights in the ahupuaa of Ohia and Manawai on the island of Molokai. Manawai is owned by Defendants-Appellees Petro, Searle, Shaner, Meyer and Hawaiian Trust Co. The land division runs from the mountains to the sea and comprises approximately 588 largely undeveloped acres used primarily for hunting and raising cattle. Ohia is divided into two parts.[1] East Ohia is 366 acres of largely undeveloped land owned by Defendant-Appellee State of Hawaii. West Ohia is owned by Defendants Wond and Pedro and consists of approximately 326 undeveloped acres used for hunting and cattle grazing.

Plaintiff is a resident of Molokai who owns a taro patch in Manawai and an adjoining houselot in East Ohia. He was raised on the lots and resided there periodically until the latter part of 1975. At the time of trial, however, he did not reside on the property. Rather, with his wife and five children, he lived in the nearby ahupuaa of Keawenui.

Kalipi asserts that it has long been the practice of him and his family to travel the lands of the Defendants in order to gather indigenous agricultural products for use in accordance

---

[1] Defendants contend that Ohia represents two, rather than a single ahupuaa. Because of our resolution of the case, we need not address this essentially factual issue.

with traditional Hawaiian practices. Among the products he gathered, and seeks the right to gather in this action, are ti leaf, bamboo, kukui nuts, kiawe, medicinal herbs and ferns. Defendants have refused to grant him unfettered access to their lands for these purposes and this action was filed to vindicate and insure an asserted right to gather such products.

A trial was had and the jury, by special verdict, determined that Kalipi had no such right. He now alleges numerous errors in the trial court's instructions to the jury and conduct of the trial. We find, for the reasons stated below, that none of the alleged errors warrants reversal.

II.

Plaintiff-Appellant Kalipi suggests three sources for his asserted gathering rights. The first is HRS § 7-1, a statute of ancient origin initially passed when the concept of private ownership of real property had first been introduced into these islands. The second is native custom and tradition, a source of the law which he claims to have been fixed in 1892 by the passage of what is now HRS § 1-1. And the third is the reservation found in all relevant documents of original title in this case, language reserving the people's "kuleana" in lands converted to fee simple ownership when such conversion first occurred.

Generally, Defendants argue that regardless of their purported sources, traditional gathering should not be recognized or enforced as a matter of policy. They characterize the rights asserted as dangerous anachronisms which conflict with and potentially threaten the concept of fee simple ownership in Hawaii.

We recognize that permitting access to private property for the purpose of gathering natural products may indeed conflict with the exclusivity traditionally associated with fee simple ownership of land. But any argument for the extinguishing of traditional rights based simply upon the possible inconsistency of purported native rights with our modern system of land tenure must fail. For the court's obligation to preserve and enforce such traditional rights is a part of our Hawaii State Constitution:

The State reaffirms and shall protect all rights, customarily and traditionally exercised for subsistence, cultural and religious purposes and possessed by ahupua'a tenants who are descendants of native Hawaiians who inhabited the Hawaiian Islands prior to 1778, subject to the right of the State to regulate such rights.

Haw. Const. art. XII, § 7. And it is this expression of policy which must guide our determinations. *See* Stand. Comm. Rep. No. 57, *reprinted in* 1 *Proceedings of the Constitutional Convention of Hawaii of 1978* at 637 (1980) ("in reaffirming these rights in the Constitution, Your Committee feels that badly needed judicial guidance is provided [,] and enforcement by the courts of these rights is guaranteed"). With this in mind, we proceed to address Kalipi's contentions.

### A.

The primary basis for Plaintiff's claim to gathering rights is HRS § 7-1, a statute initially passed in 1851 and continued in our law since that time without substantial modification. The statute, in its current form, provides that:

*Where the landlords have obtained, or may hereafter obtain, allodial titles to their lands, the people on each of their lands shall not be deprived of the right to take firewood, house-timber, aho cord, thatch, or ki leaf, from the land on which they live, for their own private use, but they shall not have a right to take such articles to sell for profit.* The people shall also have a right to drinking water, and running water, and the right of way. The springs of water, running water, and roads shall be free to all, on all lands granted in fee simple; provided, that this shall not be applicable to wells and water-courses, which individuals have made for their own use.

HRS § 7-1 (1976). The statute appears to contain two types of rights: gathering rights which are specifically limited and enumerated, and rights to access and water which are framed in general terms. While the extent and scope of the latter set of rights have been the subject of discussion by this court, *see, McBryde Sugar Co.* v. *Robinson,* 54 Haw. 174, 504 P.2d 1330, *aff'd on rehearing,* 55 Haw. 260, 517 P.2d 26 (1973), *appeal*

*dismissed and cert. denied,* 417 U.S. 962 (1974), *Palama* v. *Sheehan,* 50 Haw. 298, 440 P.2d 95 (1968), we are unable to find any previous interpretation of the gathering rights found in the statute. The issue we address is thus one of first impression.

The land division most relevant to this issue is the ahupuaa. And it is with the traditional function of the division that our analysis begins. In *Palama* v. *Sheehan, supra* at 301, 440 P.2d at 97, we discussed the significance of this division as follows:

> [I]n ancient Hawaii, the division of land known as an ahupuaa generally ran from the sea to the mountains. Such a division enabled a chief and his people to obtain fish and seaweed from the ocean, and fuel, canoe timber and mountain birds, and the right of way to obtain these things. *In Re Boundaries of Pulehunui,* 4 Haw. 239.

The cited case provides more detail:

> A principle very largely obtaining in these divisions of territory was that a land should run from the sea to the mountains, thus affording to the chief and his people a fishery residence at the warm seaside, together with the products of the high lands, such as fuel, canoe timber, mountain birds, and the right of way to the same, and all the varied products of the intermediate land as might be suitable to the soil and climate of the different altitudes from sea soil to mountainside or top.

*In Re Boundaries of Pulehunui,* 4 Haw. 239, 241 (1879). In ancient times the utilization of the ahupuaa as the principal land division was a rational one. The native people existed by a subsistence economy and the division of land discussed above enabled persons within it to obtain virtually all things necessary to survival. The traversing of an ahupuaa to gather items naturally found there was therefore a matter of practical necessity.

The governance and control of ahupuaa also conformed with the exercise of this privilege. Ahupuaa were distributed by the King to favored chiefs subject, prior to the introduction of written laws, to dispossession at the King's pleasure. And commoners were permitted to cultivate lands within the ahupuaa in exchange for services to the King and the ruling chief (if the ahupuaa were not reserved for the King himself). The well-

being of ruler and ruled was thus intertwined and the use of undeveloped lands by commoners for subsistence and culture was to the benefit of all.

With the coming of the influence of the west, the traditional system became increasingly less viable. A trading economy gradually replaced the subsistence economy and the land and its resources came to have a value apart from the labor of those who worked it. In 1848 the ancient order was formally dissolved when, by what has come to be known as the Great Mahele, the lands of the Kingdom were divided between the chiefs and King. *See generally* Chinen, The Great Mahele (1958). Many ahupuaa were granted in whole to their former lords who subsequently were able to obtain fee simple title to them upon payment of a commutation. Two years later, by the Act of August 6, 1850, commoners were permitted to obtain fee simple title to the lands which they had cultivated. And it is the last section of that Act which today survives as HRS § 7-1.

This section was included at the behest of the King and was reported to reflect his concern that a "little bit of land even with allodial title, if they [the people] be cut off from all other privileges would be of very little value." Privy Council Minutes, July 13, 1850. It therefore appears that, with respect to gathering rights, the section was included to insure that commoners would be able to exercise those rights in connection with their tenancy in order to ensure the utilization and development of their lands.

The problem is that the gathering rights of § 7-1 represent remnants of an economic and physical existence largely foreign to today's world. Our task is thus to conform these traditional rights born of a culture which knew little of the rigid exclusivity associated with the private ownership of land, with a modern system of land tenure in which the right of an owner to exclude is perceived to be an integral part of fee simple title.

We believe that this balance is struck, consistent with our constitutional mandate and the language and intent of the statute, by interpreting the gathering rights of § 7-1 to assure that lawful occupants of an ahupuaa may, for the purposes of practicing native Hawaiian customs and traditions, enter undeveloped lands within the ahupuaa to gather those items

enumerated in the statute.[2] Such activities would, of course, be subject to further governmental regulation.

By "lawful occupants" we mean persons residing within the ahupuaa in which they seek to exercise gathering rights. We thus reject Plaintiff's contention that the mere ownership of property within an ahupuaa should suffice. This limitation is dictated by the language of the statute itself. HRS § 1-14 (1976) (words of statute to be given usual meaning). It requires that the tenants be "on" the land before they become entitled to take products "from the land on which they live." We see no reason to deviate from such unambiguous language. And nothing in our caselaw or the statute's history can reasonably be interpreted to require a contrary result.[3] Moreover, we believe that the extension of these rights to absentee landlords would be contrary to the intention of the framers in that the right would thereby be spread to those whose only association with the ahupuaa may be by virtue of an economic investment.

Similarly, the limiting of gatherable items to those enumerated in the statute is a result dictated by the language of the statute. For it simply contains no suggestion that any other items were intended to be covered by the law.

The requirement that these rights be exercised on undeveloped land is not, of course, found within the statute. However, if this limitation were not imposed, there would be nothing to prevent residents from going anywhere within the ahupuaa, including fully developed property, to gather the enumerated items. In the context of our current culture this result would so conflict with understandings of property, and potentially lead to such disruption, that we could not consider it anything short

---

[2] These rights are rights of access and collection. They do not include any inherent interest in the natural objects themselves until they are reduced to the gatherer's possession. As such those asserting the rights cannot prevent the diminution or destruction of those things they seek. The rights therefore do not prevent owners from developing lands.

[3] Analogous case law, in fact, supports the conclusion reached here. See, *e.g.*, Oni v. Meek, 2 Haw. 87 (1858) (lawful occupant incorporated as definition of tenant); Damon v. Tsutsui, 31 Haw. 678 (1930) (non-severance of fishing right by transferor of property).

of absurd and therefore other than that which was intended by the statute's framers. *See, Pacific Ins. Co., Ltd.* v. *Oregon Ins. Co.,* 53 Haw. 208, 490 P.2d 899 (1971) (departure from express language permitted to avoid absurd and unjust result and is clearly inconsistent with purpose of the Act). Moreover, it would conflict with our understanding of the traditional Hawaiian way of life in which cooperation and non-interference with the well-being of other residents were integral parts of the culture.

Similarly, the requirement that the rights be utilized to practice native customs represents, we believe, a reasonable interpretation of the Act as applied to our current context. The gathering rights of § 7-1 were necessary to insure the survival of those who, in 1851, sought to live in accordance with the ancient ways. They thus remain, to the extent provided in the statute, available to those who wish to continue those ways.

Plaintiff uncontestedly did not actually reside within the ahupuaa in which he sought to exercise these gathering rights. Thus, as a matter of law, he was not entitled to the privileges discussed above.

### B.

The second basis for Plaintiff's claim to gathering rights is HRS § 1-1 which provides:

> The common law of England, as ascertained by English and American decisions, is declared to be the common law of the State of Hawaii in all cases, except as otherwise expressly provided by the Constitution or laws of the United States, or by the laws of the State, or fixed by Hawaiian judicial precedent, *or established by Hawaiian* usage . . . . (Emphasis added.)

It is his contention that the reference to "Hawaiian usage" established certain customary Hawaiian rights, including his asserted gathering rights, as the law of our State.

Conversely, Defendants contend that any customary rights which might otherwise have been retained by § 1-1 have been abrogated by judicial precedent. Specifically, they point to language in *Oni* v. *Meek,* 2 Haw. 87, 91 (1858), to the effect that the rights found in § 7-1 were declarative of "*all* the specific

rights of the hoaaina (excepting fishing rights) which should be held to prevail against the fee simple title of the konohiki. . . ." (Emphasis in original.) They thus conclude that no customary rights other than those found in that statute survived the Mahele.

We perceive the Hawaiian usage exception to the adoption of the English common law to represent an attempt on the part of the framers of the statute to avoid results inappropriate to the isles' inhabitants by permitting the continuance of native understandings and practices which did not unreasonably interfere with the spirit of the common law. *Cf., O'Brien v. Walker,* 35 Haw. 104 (1939), *aff'd,* 115 F.2d 956 (9th Cir. 1940) (Hawaiian custom and usage regarding adoption applied pursuant to statute). The statutory exception to the common law is thus akin to the English doctrine of custom whereby practices and privileges unique to particular districts continued to apply to the residents of those districts even though in contravention of the common law. *See,* 1 W. Blackstone, Commentaries *74; *see also, State ex rel Thornton v. Hay,* 254 Or. 584, 462 P.2d 671 (Or. 1969). This, however, is not to say that we find that all the requisite elements of the doctrine of custom were necessarily incorporated in § 1-1. Rather, we believe that the retention of a Hawaiian tradition should in each case be determined by balancing the respective interests and harm once it is established that the application of the custom has continued in a particular area.

In this case, Plaintiff's witnesses testified at trial that there have continued in certain ahupuaa a range of practices associated with the ancient way of life which required the utilization of the undeveloped property of others and which were not found in § 7-1.[4] Where these practices have, without harm to anyone, been continued, we are of the opinion that the reference to Hawaiian usage in § 1-1 insures their continuance for so long as no actual harm is done thereby.

---

[4] These include the gathering of items not delineated in § 7-1 and the use of defendants' lands for spiritual and other purposes.

*Oni* v. *Meek, supra,* does not preclude this conclusion, for in that case the application of the doctrine of custom was argued and the doctrine itself was not rejected. Rather, the court found the particular right asserted, the pasturage of horses, to be "so unreasonable, so uncertain, and so repugnant to the spirit of the present laws, that it ought not to be sustained by judicial authority." *Id.* at 90. And the court determined that the privilege was the product of an admitted contractual arrangement rather than a function of custom.[5] Such an analysis is consistent with our view of the § 1-1 exception. Moreover, the language in *Oni* respecting the conclusiveness of § 7-1 does not necessarily preclude the application of the doctrine. For there the plaintiff argued only that his asserted right to pasturage had a statutory basis by virtue of a pre-Mahele predecessor of § 7-1 which insured, inter alia, the right to "pasture his horse and cow and other animals" on unused land surrounding his lot. *Oni* v. *Meek, supra,* 2 Haw. at 91. He asserted that the resolution which contained this right had never been repealed and that the right therefore remained in force. The court reasoned that the subsequent enactment of commoners' rights, which did not include the aforementioned right to pasturage, implied that the legislature had not intended that it be continued so that the plaintiff could not claim the right pursuant to the pre-existing resolution.

We thus interpret *Oni* to stand for the proposition that § 7-1 expresses all commoners' rights statutorily insured at the time of the Mahele. However, inasmuch as the court did not expressly preclude the possibility that the doctrine of custom might be utilized as a vehicle for the retention of some such rights, we find no inconsistency in finding that the Hawaiian

---

[5] The opinion implies that all traditional rights may have been, in essence, contractual rather than customary insofar as commoners cultivated their lands and enjoyed privileges in exchange for services to the lord of that ahupuaa. We do not, however, adopt this conclusion. For we find it difficult to imagine any custom in any ancient culture which did not exist to in some fashion benefit those who ruled. The relevant inquiry is therefore not whether those who once ruled continue to benefit, but rather whether the privileges which were permissibly or contractually exercised persisted to the point where it had evolved into an accepted part of the culture and whether these practices had continued without fundamentally violating the new system.

usage exception in § 1-1 may be used as a vehicle for the continued existence of those customary rights which continued to be practiced and which worked no actual harm upon the recognized interests of others.

The precise nature and scope of the rights retained by § 1-1 would, of course, depend upon the particular circumstances of each case. We need not at this time, however, explore in detail the scope of any gathering and access rights which may have been demonstrated as a part of Plaintiff's case. For, as with the gathering rights of § 7-1, there is an insufficient basis to find that such rights would, or should, accrue to persons who did not actually reside within the ahupuaa in which such rights are claimed. Plaintiff therefore would have no gathering rights on the property in question pursuant to HRS § 1-1.

C.

Plaintiff's final argued source of gathering rights are reservations found in the original awards of Manawai and the eastern portion of Ohia. The reservation in the Manawai award was "Koe nae no kuleana o na kanaka maloko," translated at trial to mean "the kuleanas of the people therein are excepted." And the reservation in the governmental grant provided:

> And we do hereby declare these lands to be set apart as the lands of the Hawaiian Government, subject always to the rights of tenants.

It is the contention of the Plaintiff that these reservations retained certain traditional rights for the people, including his asserted gathering rights. Conversely, Defendants argue that the question must be decided in their favor pursuant to *Territory* v. *Liliuokalani,* 14 Haw. 88 (1902), wherein the court determined that a similar reservation did not incorporate any public right to the use of certain shoreline areas included in a grant.

We do not agree that the cited case necessarily disposes of this issue. For it dealt only with asserted public rights and not with the retained rights of ahupuaa residents or those who subsequently obtained title to their lands within an ahupuaa. However, we need not in this case delineate the precise scope of

any such rights retained by the proffered reservations. For, as with any gathering rights preserved by § 7-1 or § 1-1, we are convinced that traditional gathering rights do not accrue to persons, such as the Plaintiff, who do not live within the ahupuaa in which such rights are sought to be asserted.

### III.

Because we find that Plaintiff is, as a matter of law, without gathering rights in the ahupuaa of Manawai or Ohia because of his failure to reside in those land divisions, the judgment of the trail court is affirmed.

*Ronald Albu* (*Sandra E. Pechter* with him on the brief) for Plaintiff-Appellant.

*Steven K. S. Chung* (*Frank D. Padgett,* Attorney at Law, A Law Corporation, of counsel) for Defendants-Appellees Hawaiian Trust Company, Ltd., Ethel Shaner, Ruth Searle, Lorrin Meyer, William Meyer, Pearl Petro, Edmund Wond and Samuel Pedro.

*Che Lun Huang* ( *Lester G. L. Wong* on the brief) Deputy Attorneys General, for Defendants-Appellees State of Hawaii, Department of Land and Natural Resources and Christopher Cobb.