900 P.2d 1313

**PUBLIC ACCESS SHORELINE HAWAII, by Jerry ROTHSTEIN, its coordinator; and Angel Pilago, Appellants–Appellees,**

v.

**HAWAII COUNTY PLANNING COMMISSION, by Fred Y. FUJIMOTO in his capacity as its chairman; and Nansay Hawaii, Inc., a Hawaii corporation, Appellees–Appellants.**

No. 15460.

Intermediate Court of Appeals of Hawaiʻi.

Jan. 28, 1993.

Certiorari Granted (2 Applications)
May 7, 1993.

Roy Arnold Vitousek, III (J. Robert Arnett, II and Nani Rapoza, with him on the briefs), Kailua–Kona, for appellant Nansay Hawaii, Inc.

Joseph Kalani Kamelamela, Deputy Corp. Counsel, Hilo, for appellant Hawaii County Planning Com'n.

Paul Pickering Spaulding, III (Arnold L. Lum and John L. Olson, with him on the brief), Honolulu, for appellees PASH and Pilago.

Before BURNS, C.J., and HEEN and WATANABE, JJ.

HEEN, Judge.

This case began as an appeal to the third circuit court by Appellants–Appellees Public Access Shoreline Hawaii (PASH) and Angel Pilago (Pilago) from Appellee–Appellant Hawaii County Planning Commission's (Commission) decision (Decision) denying their request for contested case hearing procedures on Appellee–Appellant Nansay, Hawaii, Inc.'s

(Nansay) application for a Special Management Area Use Permit (SMAP) pursuant to the Coastal Zone Management Act (CZMA), Hawaii Revised Statutes (HRS) chapter 205A (1985 & Supp.1991), and approving the SMAP.[1]

After a thorough review of the record, and in light of the law regarding native Hawaiian rights, we vacate the Commission's denial of PASH's request for a contested case hearing and remand to the Commission with instructions to grant PASH's request. However, we affirm the Commission's denial of Pilago's request.

## PASH'S REQUEST

### 1.

Nansay applied to the Commission for the SMAP on March 7, 1990. The Commission held public hearings on the application on September 28, 1990, and November 8, 1990, during which many people testified or presented written testimony favoring and opposing Nansay's application. At the September 28, 1990 hearing PASH, an unincorporated community organization whose purpose is to preserve and protect public access to beaches and shorelines, requested a contested case hearing. At the November 8, 1990 hearing, PASH presented the Commission with several grounds for its request. The Commission concluded that under the Commission's rules (Rules) PASH did not have a sufficient interest in the proceeding to entitle PASH to

contested case hearing procedures. Thereafter, the Commission approved the SMAP, and PASH appealed to the circuit court.

After a hearing on PASH's appeal, the circuit court entered findings of fact, conclusions of law, and an order (Order) in which it concluded that,

> it was clearly erroneous in view of the reliable, probative, and substantial evidence on the record for the Commission to determine that the parties requesting a contested case hearing did not have interests clearly distinguishable from that of the general public and therefore did not have standing to request a contested case hearing.

The Commission and Nansay have appealed the Order.

### 2.

It is clear from the record that the Order is based in large measure on an affidavit filed in the circuit court by PASH in which Malani Pai (Pai), who had testified before the Commission that he and his ancestors had customarily gathered opae[2] in and maintained the anchialine ponds[3] on Nansay's property, averred that he was a member of PASH. PASH submitted the affidavit to support its assertion that its native Hawaiian members were affected by the Decision. The Commission's record does not contain evidence of Pai's membership in PASH. Nansay argues here that the Order is invalid because the

---

1. The notice of appeal in this case challenged the issuance of the SMAP and the denial of Appellants–Appellees' request for a contested case hearing. However, their briefs in circuit court and in this court do not challenge the merits of the SMAP. At oral argument in this court, counsel for Appellants–Appellees stated that it would have been inconsistent to have attacked the permit itself while still claiming error in the Commission's denial of a contested case hearing. In our view, Appellants–Appellees' failure to present arguments attacking the SMAP is not fatal to this appeal since, as we will discuss below, the Commission abused its discretion in denying Appellants–Appellees' request. As will be seen later in this opinion, the Commission's error effectively undermines the validity of the SMAP.

2. General name for shrimp. M. Pukui and S. Elbert, *Hawaiian Dictionary* 291 (1986).

3. Per the record, anchialine ponds are shoreline pools without surface connection to the sea having waters of measurable salinity and showing tidal rhythms. The ponds are commonly located in recent lava flows which had depressions deep enough to reach the water table. The ponds consist of brackish water with a crustacean-mollusk dominated faunal community along with several species of shrimp and a variety of vegetation types. The ponds undergo a natural process of senescence over time, changing from barren lava pools to pools with sediment bottoms and aquatic vegetation, and finally to partially filled marshes or grasslands.

circuit court did not confine its review to the record as required by HRS § 91–14(f) (1985).

We agree that the circuit court erred in considering Pai's affidavit. Nevertheless, the error can be corrected in this court, since our standard of review is the same as that of the circuit court. *IBEW, Local 1357 v. Hawaiian Tel. Co.,* 68 Haw. 316, 713 P.2d 943 (1986); *Kilauea Neighborhood Ass'n v. Land Use Comm'n,* 7 Haw. App. 227, 751 P.2d 1031 (1988). Accordingly, our review of PASH's appeal will be confined to the record before the Commission.

### 3.

On appeal, PASH concedes that a contested case hearing is not required by the CZMA;[4] however, PASH argues that on the record in this case it was entitled to contested case hearing procedures under Rules 9 and 4.

Rule 9 provides generally for the procedures to be used in processing SMAP petitions. Rule 9 provides for a public hearing on SMAP petitions but does not provide for contested case hearing procedures as set forth in HRS § 91–9 (1985).[5]

4. *See* Hawaii Revised Statutes (HRS) § 205A–29 (Supp.1991); *Sandy Beach Defense Fund v. City Council,* 70 Haw. 361, 773 P.2d 250 (1989).

5. HRS § 91–9 (1985) requires that all parties shall be afforded a hearing after reasonable notice. The statute sets forth the requisites of proper notice, provides that all parties shall have the opportunity to present evidence and argument on all issues involved, and limits the agency's consideration only to matters in the record.

6. Rule 4–2 defines the terms pertinent to a contested case as follows:
   4–2 *Definitions*
   (5) "Contested case" means a proceeding in which the legal rights, duties, or privileges of specific parties are required by law to be determined after an opportunity for agency hearing.
   (6) "Party" means any person or agency named or admitted as a party or properly seeking and entitled as of right to be admitted as a party in a proceeding. More specifically, it includes the following, upon the filing of timely requests:
   (A) Any state or county agency, and

· Rule 4 governs "Contested Case Hearing Procedures," and requires that a person requesting such hearing procedures must show that he or she has an interest in the proceeding that is clearly distinguishable from the general public.[6] PASH is a person in accordance with Rule 4–2(7).

The determination of the interests of the general public and those of the individual requesting contested case hearing procedures under Rule 4 is a determination of fact reviewable for clear error. *Protect Ala Wai Skyline v. City Council,* 6 Haw.App. 540, 544, 735 P.2d 950, 953 (1987). Whether the interest of the individual requesting contested case hearing procedures is clearly distinguishable from the interests of the general public so as to entitle the individual to contested case hearing procedures under Rule 4 is a legal conclusion reviewable on the basis of whether the Commission's conclusion is right or wrong. *Id.* With those principles in mind, we consider the Decision.

### 4.

Nansay seeks to develop a resort complex consisting of two hotels containing 800 and 250 rooms, a golf course and clubhouse, 330

   (B) Any person who has some property interest in the land, who lawfully resides on the land, or who can demonstrate that that person will be so directly and immediately affected by the Commission's decision that that person's interest in the proceedings is clearly distinguishable from that of the general public; provided that such agency or person must be specifically named or admitted as a party before being allowed to participate in the contested case hearing.
   (7) "Person" means any individual, partnership, firm, association, trust, estate, corporation, or other legal entity of any character other than an agency.
   Rule 4–6(a) provides:
   4–6 *Prehearing Procedure*
   (a) **Request for Contested Case Hearing Procedure.** A person or agency may request that a contested case hearing procedure be used in a hearing on a particular matter, provided that such request shall be made before or during the Commission's first public meeting on that matter, and not after such meeting.

multiple family residential units, 380 single family residential units, and other related improvements.[7] The project is located within the ahupua'a[8] of Kohanaiki and covers 450.09 acres. It has approximately 7,200 feet of coastline and an average depth of 4,500 feet from the coastline. Included within the proposed development are several anchialine ponds. Nansay's development impinges on the general public's access to and use of the beach area and the anchialine ponds, lateral movement along the beach, and existing ocean view planes.

At both public hearings before the Commission, all the witnesses were placed under oath. The persons testifying in opposition to the SMAP were generally concerned with the effect that Nansay's development would have on historic and cultural sites, access to and use of the beach area for surfing, fishing, swimming, picnicking, camping, and a number of other outdoor activities. Nearly all attested that they, their ancestors, friends, and family have used the area for such purposes over a long period of time. Some speakers were opposed to any interference with the view plane to the ocean. The opponents of the SMAP either opposed the development outright or demanded assurance of continued access and use.

At the September 28, 1990 hearing, Marcel Keanaina testified as follows:

> In the late 1920's and early 1930's [my family] talked about seeing two fishermen, Kanakamaikai and Pali who lived at Honokohau and went to the opae ponds to get bait to fish for opelu.[9]

(Footnote added.)

At the November 8, 1990 hearing, Pai testified, in part, as follows:

> I'm a resident of Honokohau Village. For generations my family and others have been utilizing and maintaining the anchialine ponds at Kohanaiki. I'm very concerned that in the pond management plan of the proposed Nansay development at Kohanaiki, there's no acknowledgment of native Hawaiian access to the anchialine ponds. I am worried that I will be prevented from harvesting and working the ponds for opaeula and opaelulu. We use the opaeula for catching opelu and then the opelu to catch ahi. We use the opaelulu to catch the uu, aweoweo, akule and wekeula. We are concerned that we will be cited for trespassing as we attempt to continue this important part of our livelihood.

At the September 28, 1990 hearing on the SMAP petition, the PASH representative, Mr. Jerry Rothstein (Rothstein) submitted a written statement. In his statement, Rothstein stated that "Traditional rights of native Hawaiian families to engage in utilizing and maintaining the anchialine ponds at Kohanaiki, may be interrupted or denied." At the November 8, 1990 hearing at which the Commission considered PASH's request for a contested case hearing, Rothstein stated under oath:

> Another issue, a very important one, is the native Hawaiian fishing and food gathering rights, *of which our members are directly impacted.* [sic] ... Okay, *that's an impact, the traditional gathering rights which are going to be harvesting, maintaining from those ponds, which our members have engaged in, their families for decades.*

(Emphasis added.)

In a letter to the Commission dated November 8, 1990, Rothstein stated that "PASH has members who are regular users of the area for ... pond maintainance and harvesting[.] Their interests need to be protected."

---

7. Nansay apparently also has plans for a marina development in the future. However, that proposal is not a part of Nansay's petition in this case.

8. Land division usually extending from the mountains to the sea. *In re Boundaries of Pulehunui,* 4 Haw. 239 (1879).

9. Norman Akahai Keanaina also sent a letter to the Commission dated November 8, 1990, in which he stated that the Keanaina family claimed ownership of Kohanaiki.

The SMAP contains numerous conditions designed to address the concerns expressed by the speakers, including establishment of a program for preserving and maintaining archaeological sites and the anchialine ponds.

5.

■ As we will now discuss, a native Hawaiian who has exercised such rights as were customarily and traditionally exercised for subsistence, cultural, and religious purposes on undeveloped lands of an ahupua'a has an interest in a proceeding for the approval of an SMAP for the development of lands within the ahupua'a which are clearly distinguishable from that of the general public.

■ The subject of native Hawaiian gathering rights was first discussed by our supreme court in *Kalipi v. Hawaiian Trust Co.*, 66 Haw. 1, 656 P.2d 745 (1982). In that case, the supreme court held that such gathering rights are derived from three sources: article XII, § 7, of the Hawaii State Constitution, and HRS §§ 7-1 and 1-1 (1985). In article XII, § 7,

[t]he State reaffirms its obligation and shall protect all rights, customarily and traditionally exercised for subsistence, cultural and religious purposes and possessed by ahupua'a tenants who are descendants of native Hawaiians who inhabited the Hawaiian Islands prior to 1778, subject to the right of the State to regulate such rights.

In HRS § 7-1, the legislature has provided that "the people" have the right to gather certain enumerated items "from the land on which they live, for their own private use." [10] HRS § 1-1 declares the common law of England as ascertained by English and American decisions to be the common law of Hawaii,

"except as otherwise expressly . . . established by Hawaiian usage[.]"

In *Kalipi*, the supreme court held that lawful residents of an ahupua'a may, for the purposes of practicing native Hawaiian customs and traditions, enter undeveloped lands within the ahupua'a to gather the items enumerated in HRS § 7-1. However, those rights are limited to the items enumerated in HRS § 7-1. The supreme court also held that it is obligated "to preserve and enforce such traditional rights" under article XII, § 7. *Id.*, 66 Haw. at 4, 656 P.2d at 748. The *Kalipi* court further stated that HRS § 1-1 ensures the continuation of other native Hawaiian customs and traditions not specifically enumerated in HRS § 7-1 that may have been practiced in certain ahupua'a "for so long as no actual harm is done thereby." *Id.* at 10, 656 P.2d at 751.

In the recent case of *Pele Defense Fund v. Paty*, 73 Haw. 578, 837 P.2d 1247 (1992), the supreme court again discussed native Hawaiian gathering rights, explained *Kalipi*, and expanded on the rights established in *Kalipi*.

■ In *Pele*, the supreme court explained that, although in *Kalipi* it had recognized the gathering rights of native Hawaiians under HRS § 7-1, *Kalipi* allowed only the residents of an ahupua'a to exercise those rights on undeveloped lands within the ahupua'a. However, based on the record of the constitutional convention of 1978 which promulgated article XII, § 7, the supreme court held in *Pele* that the provision should not be narrowly construed. Accordingly, in *Pele* the supreme court held that "native Hawaiian rights protected by article XII, § 7, may extend beyond the ahupua'a in which a native Hawaiian resides where such rights have

10. HRS § 7-1 (1985), which was originally enacted in 1851, provides as follows:

**Building materials, water, etc.; landlords' titles subject to tenants' use.** Where the landlords have obtained, or may hereafter obtain, allodial titles to their lands, the people on each of their lands shall not be deprived of the right to take firewood, house-timber, aho cord, thatch, or ki leaf, from the land on which they live, for their own private use, but they shall

not have a right to take such articles to sell for profit. The people shall also have a right to drinking water, and running water, and the right of way. The springs of water, running water, and roads shall be free to all, on all lands granted in fee simple; provided that this shall not be applicable to wells and watercourses, which individuals have made for their own use.

been customarily and traditionally exercised in this manner." *Id.*, 73 Haw. at 620, 837 P.2d at 1272.

■ The gathering activity described in the record in this case and asserted by PASH as a right of its native Hawaiian members is not enumerated in HRS § 7-1. Consequently, the activity is not entitled to the protection of article XII, § 7, unless it has been shown that it is a right "customarily and traditionally exercised [on the ahupua'a of Kohanaiki] for subsistence ... purposes and possessed by ... descendants of native Hawaiians who inhabited the Hawaiian Islands prior to 1778[.]" Thus, to be entitled to intervention, PASH was required to show that the gathering of opae was customarily and traditionally practiced on the Kohanaiki land and that some of PASH's native Hawaiian members exercised those rights.[11] The record contains sufficient evidence to establish those requisites. Rothstein, Marcel Keanaina and Pai were all under oath when they testified, and their testimony is unrefuted. Their testimony was sufficient to show that the gathering of opae from the anchialine ponds on the ahupua'a of Kohanaiki has been customarily and traditionally exercised by native Hawaiians and by PASH's native Hawaiian members.

In *Pele* the supreme court stated that,

the rights of native Hawaiians are a matter of great public concern in Hawaii. This court has repeatedly demonstrated its fundamental policy that Hawaii's state courts should provide a forum for cases raising issues of broad public interest, and that the judicially imposed standing barriers should be lowered when the "needs of jus-

tice" would be best served by allowing a plaintiff to bring claims before the court. *Life of the Land v. The Land Use Comm'n*, 63 Haw. 166, 176, 623 P.2d 431, 441 (1981) ("Our touchstone remains 'the needs of justice.' ")[.]

*Id.*, 73 Haw. at 614-15, 837 P.2d at 1268-69.

■ Article XII, § 7, imposes on the Commission the same obligation to preserve and protect native Hawaiian rights as it does on the court. *See generally Pac. N'west Bell Tel. Co. v. Sabin*, 21 Or.App. 200, 534 P.2d 984 (1975).

In concluding that PASH had not shown that its interest in the proceeding was clearly distinguishable from that of the general public, the Commission disregarded the rules regarding the gathering rights of native Hawaiians and its obligation to preserve and protect those rights. Thus, PASH was entitled to contested case hearing procedures, and the Commission erred as a matter of law when it denied PASH's request.

■ We are aware that *Kalipi* and *Pele* only guarantee access to undeveloped lands and do not require that any lands be held in their natural state for the exercise of native Hawaiian rights.[12] *Pele*, 73 Haw. at 621 n. 36, 837 P.2d at 1272 n. 36. Also, *Kalipi* and *Pele* do not discuss the question of what happens to those gathering rights in a situation, such as we have here, where the property owner wishes to develop his property. However, it is our view, in light of article XII, § 7, that all government agencies undertaking or approving development of undeveloped land are required to determine if native Hawaiian gathering rights have been custom-

---

11. An association may be an aggrieved person with standing to challenge an agency's action if it can show that some of its members are "specifically, personally and adversely affected by the agency's action." *Life of the Land v. Land Use Comm'n*, 61 Haw. 3, 8, 594 P.2d 1079, 1082 (1979).

12. The requirement that these rights be exercised on undeveloped land is not, of course, found within the statute. However, if this limitation were not imposed, there would be nothing to prevent residents from going anywhere

within the ahupua'a, including fully developed property, to gather the enumerated items. In the context of our current culture this result would so conflict with understandings of property, and potentially lead to such disruption, that we could not consider it anything short of absurd and therefore other than that which was intended by the statute's framers.
*Kalipi v. Hawaiian Trust Co.*, 66 Haw. 1, 8, 656 P.2d 745, 750 (1982).

arily and traditionally practiced on the land in question and explore the possibilities for preserving them. At least that much is required by article XII, § 7.

On remand, it may be feasible for the Commission to impose some reasonable conditions on the SMAP to protect the native Hawaiian rights in this case where those conditions would not cause actual harm.[13] See Kalipi, 66 Haw. at 10, 656 P.2d at 751 ("[T]he retention of a Hawaiian tradition should in each case be determined by balancing the respective interests and harm once it is established that the application of the custom has continued in a particular area."). For example, we note that a condition of the SMAP reads as follows:

> An anchialine pond management plan shall be submitted to and approved by the Planning Director prior to receipt of Final Plan Approval of any of the proposed uses or prior to conducting any land preparation activity in the affected area, whichever occurs first. The Management Plan shall be developed in consultation with the Army Corps of Engineers and the U.S. Fish and Wildlife Service. The objective of its management plan shall be to: 1) maintain the environmental integrity of the existing ponds, 2) protect and manage this resource to provide educational and interpretive opportunities to the public, 3) control and monitor construction activities so that impacts may be identified and mitigated to avoid any detrimental impacts to the pond, and 4) provide for a pond manager to implement the management plan and conduct scientific monitoring programs. The Management Plan will detail the area of ponds to be preserved, the dimensions of buffer zones surrounding the pond area,

allowable activities within the pond areas, if any, and establish a pond management program.

Perhaps the Commission could have included in the condition a provision protecting the opae gathering activities as a part of the anchialine pond management program. Such a condition would appear to be in keeping with the objectives and policies of the CZMA as expressed in HRS § 205A–2.

## PILAGO'S REQUEST

■ Pilago testified before the Commission that his interest in the proceeding was that he felt that Nansay's development would destroy important cultural sites, including perhaps the burial ground of King Kamehameha.[14] He contended that "Hawaiians deserve conclusive and irrefutable proof that no burial site is desecrated. Should investigations show evidence of a burial site, then that area must be preserved and protected." Pilago did not claim to have exercised any cultural or religious activities on the property.

It must be conceded that, as a Hawaiian, Pilago has a "special" interest in the proceeding. However, Pilago did not assert that he or other native Hawaiians had engaged in any activities that might be protected under article XII, § 7. Therefore, Pilago did not show that his interest is "personal," i.e., that it is clearly distinguishable from that of the general public. While Pilago's concern for the possibility that King Kamehameha is buried on the project site is more specific than the concern for cultural site preservation expressed by others at the hearings, it is not enough, in our view, to satisfy Rule 4–2(6)(B).[15]

---

13. We emphasize, however, that the Commission is not compelled to do so, since the property will no longer be undeveloped lands.

14. We take judicial notice that King Kamehameha's burial place is unknown.

15. One policy of the coastal Zone Management Act is to "[i]dentify and analyze significant archaeological resources[,]" HRS § 205A–

2(c)(2)(A) (1985), and to "[m]aximize information retention through preservation and remains and artifacts or salvage operations." HRS § 205A–2(c)(2)(B) (1985). In accordance with that policy, the SMAP requires the Planning Department to approve an archaeological site preservation plan to be prepared by Nansay, and requires Nansay to cease work if unanticipated archaeological sites are uncovered and not to

CONCLUSION

The Commission's denial of PASH's request for contested case hearing procedures is vacated, and this matter is remanded to the Commission with instructions to grant PASH's request for contested case hearing procedures. The Commission's denial of Pilago's request is affirmed.

resume work until permitted to do so by the        Planning Director.