**UNITED STATES, Appellant,**

**v.**

**Elwin W. POWELL and William C. Wardlaw, Appellees.**

**Nos. 88–480, 88–501.**

District of Columbia Court of Appeals.

Argued May 17, 1989.

Decided Sept. 15, 1989.

Daniel S. Seikaly, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., Michael W. Farrell, Asst. U.S. Atty. at the time the motion was filed, and John D. Bates and R. Craig Lawrence, Asst. U.S. Attys., were on the motion for summary reversal, for appellant. Kevin F. Flynn, Asst. U.S. Atty., also entered an appearance for appellant.

Mark L. Goldstone, appointed by this court, for appellees.

Before NEWMAN, FERREN, and TERRY, Associate Judges.

TERRY, Associate Judge:

Appellees were each charged by information with unlawful entry, in violation of D.C.Code § 22–3102 (1981). When they moved to dismiss the informations against them, the court set their motion for hearing on the scheduled trial date. The case came on for trial a few weeks later, and the trial judge, after hearing argument but no testimony, denied the motion. A jury was then selected and sworn, and the government presented its evidence. At the conclusion of the government's case, appellees renewed their motion to dismiss, and this time the court, having heard the relevant evidence, granted it. From that order the government appeals.[1] We reverse the dismissal and remand the case with directions to reinstate the informations.

I

The Washington Metropolitan Area Transit Authority (WMATA) operates the Metrorail subway system, commonly known as Metro, in the District of Columbia and its suburbs. The busiest station in the system is one in downtown Washington known as Farragut West. The east entrance to the Farragut West station is at the southeast corner of 17th and I Streets, N.W., across the street from Farragut Square. Passengers alighting from subway trains at Farragut West who intend to leave by the east entrance ride escalators

---

1. Both appellees expressly waived their double jeopardy rights in open court after being thoroughly questioned by the trial judge. They offer no challenge here to those waivers, and there is no doubt in our mind that the waivers were intelligently made and valid. *See Mason v. United States,* 346 A.2d 250, 252 (D.C.1975).

from the underground platforms to get to the street level. At the top of the escalators, however, the departing passengers do not immediately find themselves on city sidewalks, but in an area approximately forty-four by fifty-four feet belonging to WMATA. This rectangular space is bounded on the west by 17th Street, on the north by I Street, on the east by a wall, and on the south by the Hill Building. The second story of the Hill Building overhangs the entire area.

For some time prior to the fall of 1987, about four to eight persons, apparently homeless, sought shelter almost every night in the east entrance to the Farragut West station. As a result, according to David Cooksey, director of WMATA's Office of Facilities Maintenance, the sidewalk, escalators, and underground areas became "unsightly," "unsanitary," and "unsafe." Cooksey testified that "large amounts of human excrement [were] left at the bottom of the escalators each morning, [and the] escalator pits in which my mechanics had to pull maintenance were filled with urine...." Consequently, the east entrance to the Farragut West station had to be cleaned two more times a day than other station entrances, besides having to be hosed down with highpressure steam and water about twice a week, eight times as often as other stations. The corrosive effect of urine on the working parts of the escalators resulted in "additional maintenance requirements of some significance." The additional cost "over and above the normal maintenance" was more than $16,-000 a year.[2] Furthermore, Lieutenant Frank Belton of the WMATA Transit Police testified that not only did loiterers menace the subway patrons, but so much fecal matter was left in the area by the overnight sojourners that early-morning commuters had to "do a hopscotch" when getting on or off the escalators.

In October 1987 Mr. Cooksey took corrective action by ordering the installation of a pair of folding, accordion-like gates at the Farragut West station, one on the 17th Street side and one on the I Street side.[3] Cooksey testified that the "geometry of that particular entrance" made it impossible to put a gate directly in front of the escalators so as to leave the surrounding area open. The gates were therefore placed on the property line dividing WMATA's property from the public sidewalk belonging to the District of Columbia. Consequently, once the gates were closed, no one could use or walk upon any part of the WMATA property, although any person could still use the public sidewalks on the two adjacent streets. The gates were closed when the station closed, and the station regularly shut down at 12:30 a.m.

On November 24, 1987, however, the Washington Redskins were playing a Monday night football game at Robert F. Kennedy (RFK) Stadium. The game ran past midnight, so Metro authorities kept the subway running after the usual closing time to accommodate fans who left the stadium after 12:30 a.m. Thus, when Lieutenant Belton came on duty at the Farragut West Metro station shortly after midnight, the transit system was still operating. He immediately noticed about forty to fifty people, some of whom were singing, congregated in front of the escalators at the street level. Because another group had demonstrated against the installation of the gates about a week earlier, Belton assumed that these people were demonstrators also, although no demonstration permit had been issued, and Belton saw no

2. Mr. Cooksey said there were other stations that were experiencing similar problems, but this one was the worst, apparently because "the architecture of this particular entrance"—a roof and two walls partially enclosing a relatively large space—"made it a more favorable shelter from the elements" than many of the other subway entrances.

3. Cooksey testified, without contradiction and without objection, that the WMATA Organiza-

tional Manual gave him the authority to order the gates installed after getting permission from the owner of the Hill Building and the necessary construction permit from the District of Columbia. His decision was later "supported" by WMATA's Board of Directors, although Mr. Cooksey did not know whether the Board took a formal vote on the matter. No public hearings were held before the gates were erected.

placards to explain what they were doing there. Knowing that the station would be open later than usual because of the football game,[4] he allowed them to remain there after 12:30.

After the last train from RFK Stadium passed through Farragut West at about 2:00 a.m., the station attendant was ordered to close the station for the night. When the attendant went to the street level, however, he realized that he could not close the two gates because, if he did so, the assembled group of people would be locked inside the station. In an effort to clear the area, Lieutenant Belton told these people that they must leave WMATA property or be subject to arrest for unlawful entry. Everyone left.

About ten minutes later Lieutenant Belton noticed appellees Powell and Wardlaw, whom he had not seen with the group earlier, sitting together on the pavement with their backs against the wall, facing the escalators. They carried no signs or other symbols to indicate why they were there at that hour. Moreover, they were inside the area that would be enclosed by the gates. Belton told them that the station was closed for the night and that they too must leave WMATA property. Appellees said nothing. Receiving no response, and being under orders to secure the area for the night, Lieutenant Belton ordered them arrested. When they refused to stand up and walk out on their own, they were carried out to a police vehicle. During their arrest, appellees remained silent.

At the close of the government's case in chief, the court denied (correctly) appellees' motion for judgment of acquittal. Appellees then renewed their pretrial motion to dismiss the informations. Because jeopardy had attached, *see, e.g., Routh v. United States*, 483 A.2d 638, 641–642 (D.C.1984),

the court asked them in the presence of counsel if they wished to waive their right to have the empaneled jury decide the case, thereby subjecting them to retrial at a later date. After appellees agreed to the waiver, the court granted their motion to dismiss.[5] The court's reasons for granting the motion were given orally from the bench:

> I really think [the cases] should be dismissed and then taken on up to the Court of Appeals and let them say if you have enough on the fence alone, then bring it on back. [That would] be all right with me.

As we read these and similar remarks, the trial court based its dismissal on what it saw as the failure of the government to prove an additional specific factor establishing appellees' lack of a legal right to remain on WMATA property.

## II

■ For purposes of the unlawful entry statute, WMATA property is considered to be public property. *See O'Brien v. United States*, 444 A.2d 946, 948 (D.C. 1982). When a person is charged in the District of Columbia with unlawful entry on public property, the government must prove "some additional specific factor establishing the [person's] lack of a legal right to remain." *Id.* (citations omitted). "Such factors may consist of posted regulations, signs, or *fences and barricades* regulating the public's use of government property...." *Carson v. United States*, 419 A.2d 996, 998 (D.C.1980) (emphasis added). The purpose of this requirement is to protect any First Amendment rights which may be implicated in the defendant's conduct, so that "an individual's lawful presence is not conditioned upon the mere whim of a public official...." *Leiss v. United*

---

**4.** Belton testified, "If we have a special event, the station will remain open until the event is over." Monday night football games were regarded as such "special events." Mr. Cooksey likewise stated that WMATA would "modify [its] hours" for night football games, New Year's Eve, Fourth of July celebrations, "or those other things that are obviously going to continue after our normal closing hours."

**5.** Appellees did not and do not now challenge the sufficiency of the informations as charging documents. We are satisfied that the informations validly served their purpose, which was to give appellees fair notice of the charges against them and to enable them to avoid the dangers of double jeopardy. *See Clemons v. United States*, 400 A.2d 1048, 1051 (D.C.1979).

*States,* 364 A.2d 803, 806 (D.C.1976), *cert. denied,* 430 U.S. 970, 97 S.Ct. 1654, 52 L.Ed.2d 362 (1977); *see Wheelock v. United States,* 552 A.2d 503, 505 (D.C.1988); *O'Brien v. United States, supra,* 444 A.2d at 948. We hold that the required "additional specific factor" in this case was the pair ·of gates which WMATA personnel closed every night at the conclusion of the day's business.[6]

█ A fence, a gate, or any other barrier which controls public access to property gives notice to persons that they do not have a legal right to enter or remain in a certain area. *See, e.g., Culp v. United States,* 486 A.2d 1174, 1177 (D.C.1985) (boarded-up windows put public on notice that intruders were not welcome in unoccupied house); *Carson v. United States, supra,* 419 A.2d at 998 (chain separating White House lawn from path used by tourists indicated that tourists were obliged to stay on the path); *Smith v. United States,* 281 A.2d 438, 440 (D.C.1971) (locked gates and chain link fence provided sufficient notice that unauthorized persons were not to enter property); *Bowman v. United States,* 212 A.2d 610 (D.C.1965) (gate in railroad station with sign above it stating that only ticket holders were permitted to enter put ticketless defendant on notice that he was unlawfully entering the area beyond the gate). But even though the gates at the Farragut West Metro station constitute an additional specific factor in this case, the installation and use of those gates must nonetheless be reasonable, *i.e.,* must further a significant governmental interest in a narrow, content-neutral way which leaves open alternative avenues of communication. *See Smith v. United States,* 445 A.2d 961, 964–965 (D.C.1982) (en banc) (citing cases); *O'Brien v. United States, supra,* 444 A.2d at 948 (citing cases).

█ The uncontroverted testimony established that the gates are closed only during non-revenue hours, which are normally between 12:30 a.m. and 5:30 a.m.— hours which are posted throughout the Metro system and in train schedules, as well as publicized in the media. The gates are not shut at the whim of some official, but at these regularly scheduled, well-publicized times. *See Leiss v. United States, supra,* 364 A.2d at 807. Special events, such as Monday night football games, may require the system to be kept open beyond 12:30, but when the need for service ends, the system is shut down until the next morning. Thus Metro officials do not have unbridled discretion in deciding when to clear the station and close the gates. The evidence shows that the putative demonstrators were not ushered out of the area at the usual 12:30 a.m. closing time, but instead were allowed to remain there precisely because the station had to stay open late in order to serve fans coming from the football game. The conclusion is inescapable that the gates are closed when, and only when, the Metro system ceases operations for the night, and not at the caprice of any Metro official.[7]

Finally, there is no evidence whatever that appellees were asked to vacate the Metro station because of their message; in fact, Lieutenant Belton had no way of knowing what their message was, if any,

---

6. Regulation 5 of WMATA's Rules and Regulations of Free Speech prohibits all "free speech" activities within fifteen feet of "any escalator, stairwell, fare gates, kiosk, or fare card machine." The fifteen-foot rule applies to activities that take place on Metro property located at the street level, as in this case. It is undisputed, however, that appellees were sitting more than fifteen feet from the top of the escalators, and the fare gates, kiosk, and fare card machines were all underground. Consequently, Regulation 5 cannot serve as the additional specific factor establishing their lack of a legal right to remain on WMATA property.

7. The physical presence of the gates, the non-discretionary way in which the gates were operated, the limited times during which the gates were closed, and the governmental interest served by the gates distinguish this case from *Community for Creative Non–Violence v. Turner,* 714 F.Supp. 29 (D.D.C.1989). In that case the United States District Court enjoined WMATA from enforcing an unpublished regulation requiring persons who wanted to engage in free speech activity on any part of WMATA property to obtain a permit and to conduct their activity according to specified guidelines. Neither that regulation nor any other WMATA regulation is involved in this case. See note 6, *supra.*

other than to surmise that they might be "demonstrating" because other persons had recently protested the installation of the gates.[8] Thus, insofar as it might have affected the exercise of appellees' First Amendment rights, the closing of the gates was content-neutral. Furthermore, as the evidence showed, the gates had been installed to promote what we have held to be a significant governmental interest, *viz.,* keeping the subway system safe for its passengers. *O'Brien v. United States, supra,* 444 A.2d at 949. We will not substitute our judgment for that of the Metro authorities as to how best to achieve that goal. *See Clark v. Community for Creative Non–Violence, supra* note 8, 468 U.S. at 299, 104 S.Ct. at 3072 (courts lack "the authority to replace the Park Service as the manager of the Nation's parks or ... the competence to judge how much protection of park lands is wise and how that level of conservation is to be attained" (footnote omitted)). Moreover, an alternative channel of communication was readily available—the adjacent public sidewalks on 17th and I Streets, just a few feet from where appellees were sitting. If appellees were protesting against the gates, all they had to do was to walk a few steps to continue their protest on the sidewalk. *See O'Brien v. United States, supra,* 444 A.2d at 949; *Leiss v. United States, supra,* 364 A.2d at 808-809; *cf. Pell v. Procunier,* 417 U.S. 817, 823-824, 94 S.Ct. 2800, 2804-2805, 41 L.Ed.2d 495 (1974) (availability of alternative means of communication is a relevant factor in balancing First Amendment rights against legitimate governmental interests).

8. "[I]t is the obligation of the person desiring to engage in assertedly expressive conduct to demonstrate that the First Amendment even applies." *Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 293 n. 5, 104 S.Ct. 3065, 3069 n. 5, 82 L.Ed.2d 221 (1984); *accord, Spence v. Washington,* 418 U.S. 405, 411, 94 S.Ct. 2727, 2730, 41 L.Ed.2d 842 (1974) (to be protected under the First Amendment, conduct must "convey a particularized message"). Because we reverse on the ground that the gates constituted an additional specific factor, we do not reach the issue of whether there was sufficient evidence to show that these two appellees were engaged in First Amendment activity. We note, however, that the trial judge, at the time he

For the foregoing reasons, the order of the Superior Court dismissing the informations is reversed, and this case is remanded for further proceedings. Because appellees have expressly waived their privilege against double jeopardy, the government is free to retry them if it so desires.

*Reversed and remanded.*

dismissed the informations, was himself unsure as to what appellees were doing at the Farragut West Metro station at 2:00 in the morning. He said:

> *I don't know* whether they were handing out materials or what. *The evidence doesn't disclose that,* but the evidence disclosed that there were people singing and chanting, I believe they said, and perhaps someone said they were praying too. I'm not positive about that, but they were involved in some type of activity out there. They weren't out there just trying to keep warm, as it were. *Maybe they were keeping warm,* but I *think* the purpose was to demonstrate as it were. [Emphasis added.]