970 P.2d 485

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Alapai HANAPI, Defendant–Appellant.**

**No. 19746**

Supreme Court of Hawai'i.

Nov. 20, 1998.

Reconsideration Denied Feb. 8, 1999.

**178** .

Brian K. Nakamura, on the briefs, Honolulu, for defendant-appellant.

Moana M. Lutey, Deputy Prosecuting Attorney, on the briefs, for plaintiff-appellee.

MOON, C.J., KLEIN, LEVINSON, NAKAYAMA, and RAMIL, JJ.

Opinion of the Court by KLEIN, J.

Defendant-appellant Alapai Hanapi appeals from his conviction of and sentence for criminal trespass in the second degree, in violation of Hawai'i Revised Statutes (HRS) § 708–814(1)(a) (1993).[1] On appeal, Hanapi contends that his conviction should be reversed because: (1) the district court committed reversible error when it excluded relevant evidence and testimony in support of his constitutionally protected native Hawaiian rights; and (2) there was insufficient evidence to convict him because the prosecution failed to negative his native Hawaiian rights claim. Because Hanapi failed to show that his conduct constituted protected constitutional activity, we affirm his conviction of and sentence for criminal trespass in the second degree.

## I. BACKGROUND

Hanapi and his wife, Louise, assert that they are "native Hawaiian artists and cultural practitioners who work, live, and reside on the ancestral family kuleanā within the ahupua'a of 'Aha'ino on the island of Moloka'i." Adjoining the Hanapis' property are twin fishponds popularly called Kihaloko and Waihilahila. Hanapi maintains that "for generations [his] family and ... ancestors have practiced traditional native Hawaiian religious, gathering, and sustenance activities in and around the fishponds."

Gary Galiher purchased the land next to the Hanapis' property. Galiher subsequently fenced the property and allegedly began to grade and fill the area near the ponds with the apparent intention of building a boat landing.[2] The Hanapis viewed Galiher's grading as "the desecration of [a] traditional ancestral cultural site" and allegedly voiced their objection, first with Galiher and then to the U.S. Army Corps of Engineers (COE).

The COE determined that a "wetlands violation" occurred and entered into an agreement with Galiher to restore the property.[3] The COE agreed to a voluntary, unsupervised restoration of the property, subject to the advice and oversight of a consultant/archaeologist. Galiher hired Aki Sinota, an archaeologist, and Vernon Demello, the on-site supervisor, to remove the fill and restore the property.

The restoration took place on August 14–16, 1995. The work consisted principally of removing the fill and regrading the land with a bulldozer. For the first two days, Hanapi[4] entered the property without incident to observe and monitor the restoration.

On the third day, Demello told Hanapi that he was not to enter the property. Ignoring the warning, Hanapi entered the property

---

1. HRS § 708–814 states in relevant part:
   **Criminal trespass in the second degree.** (1) A person commits the offense of criminal trespass in the second degree if:
   (a) The person knowingly enters or remains unlawfully in or upon premises which are enclosed in a manner designed to exclude intruders or are fenced[.]
   . . .
   (2) Criminal trespass in the second degree is a petty misdemeanor.

2. This background fact was mentioned in Hanapi's opening brief, but not reflected in the trial transcripts.

3. As near as we can tell, Galiher committed an alleged "wetlands violation" and entered into an agreement with the COE to restore his property. No further facts were available regarding Galiher's violation. *See infra,* part III.A.

4. It appears from the record that Hanapi and his wife were both present on Galiher's property throughout the restoration process. However, we will not address Louise's participation in this case unless it relates to issues concerning Hanapi.

and allegedly observed Demello using a bulldozer to push the fill into a "punawai," or fresh water spring. Hanapi believed the destruction of the "punawai" was not consistent with the restoration ordered by the COE and complained to Sinota. Sinota explained to Hanapi that the water was not a spring, but actually water that had collected in a hole left by an uprooted tree. During this discussion, Demello approached Hanapi and ordered him off the property. When Hanapi refused to leave, police were called and arrested Hanapi for criminal trespass in the second degree, in violation of HRS § 708–814.

Trial commenced in the District Court of the Second Circuit on November 14, 1995, with Hanapi appearing *pro se.* At trial, Galiher stated that he employed Demello as a foreman to maintain and operate equipment on his land and "take[ ] on assignments as I give him." Galiher also testified that he gave Demello the authority to exclude people from his enclosed property.

Demello testified that on August 16, 1995, when Hanapi came onto Galiher's property he asked him to leave the premises. Hanapi refused Demello's request and the police were called. Demello stated Hanapi was arrested and removed from the premises.

As part of Hanapi's defense, he called his wife, Louise, to testify on his behalf. Hanapi first asked Louise if she knew what was happening on Galiher's premises the day he was arrested. Louise responded that "[t]here was a wetland[s] violation that was issued by the ... [COE] ... to restore the wetland area [on Galiher's property]." The prosecutor objected on the grounds of relevance. Hanapi advised the court that he was "trying to establish [his] rights [as a native tenant] ... on the land regardless of whether Mr. Galiher ... owned it or not[.]" The court sustained the prosecution's objection and told Hanapi, "[y]ou're getting into something that is a Circuit Court matter, Mr. Hanapi. Right now we are talking about trespass."

Hanapi persisted in his attempt to assert his constitutional rights as a native Hawaiian tenant and sought to elicit further testimony from Louise concerning the native Hawaiian right being claimed by him at the time of his arrest. The following colloquy took place:

[DEFENDANT]: Are you aware of native tenant laws?

[LOUISE]: Yes, I am.

[DEFENDANT]: Do you exercise your native tenant right in the ahupua'a?

[LOUISE]: Yes, I do.

[DEFENDANT]: Were you there and were members of your family there exercising your native rights on the property?

[LOUISE]: Yes, we were.

[PROSECUTOR]: Your Honor, I'm going to object as to relevance.

[COURT]: What's the relevance, Mr. Hanapi?

[DEFENDANT]: I'm trying to show the Court that we had a right to be there, your Honor, during this time, during this particular time.

[COURT]: Well, see if you can. Go ahead.

[DEFENDANT]: So you were there. Was anybody else with you from your family or anybody who lives in the ahupua'a, were they there on the property?

[LOUISE]: Yes. My sister. On the second day my sister was there.

[DEFENDANT]: Anybody else?

[LOUISE]: Yes. There were other family members (inaudible).

. . .

[DEFENDANT]: [Louise], would you explain what you were doing there on the property?

[PROSECUTOR]: Your Honor, I'm going to object as to relevance.

[COURT]: Objection is sustained.

[DEFENDANT]: As a[n] ahupua'a tenant, as a native tenant, do you have a responsibility and obligation to the natural resources of your ahupua'a?

[LOUISE]: I certainly do. It's my responsibility to be aware of what's happening in my ahupua'a because—

[PROSECUTOR]: Your Honor, I'm going to ask that you strike anything past the word yes. It's narrative.

[COURT]: Stricken. Anything past the word yes is stricken.

[DEFENDANT]: So do you have a moral—I mean a responsibility and obligation to—

[LOUISE]: Yes.

[PROSECUTOR]: I object as to leading.

[COURT]: Asked and answered.

[DEFENDANT]: Do you have [an] obligation and responsibility to the aina?

[COURT]: Objection.

[PROSECUTOR]: Your Honor, I object.

[COURT]: Objection sustained. Same question, same answer.

. . .

[COURT]: Now what is happening is that you're asking her the same question over and over again. You're asking her is she aware of native rights. She's answered yes. Now, from now on anything you ask that will the be the same question I will sustain the objection because the answer has already been given to you. Okay?

[DEFENDANT]: Thank you, your Honor. I mean no disrespect.

[COURT]: All right. Move along.

[DEFENDANT]: Did you have a right to be on the property?

[PROSECUTOR]: Your Honor, I'm going to object.

[COURT]: What's your objection?

[PROSECUTOR]: Your Honor, she is not before this Court being charged with criminal trespass. It's not relevant.

[DEFENDANT]: If she's a witness—she was there at that time of the day.

[COURT]: The objection is sustained, Mr. Hanapi.

Despite several adverse rulings, Hanapi continued to question Louise about the moral obligation native Hawaiian tenants have to the land.

[DEFENDANT]: Is this property developed?

[PROSECUTOR]: I'm going to object as to relevance.

[COURT]: What's the relevance, Mr. Hanapi?. What is the relevance?

[DEFENDANT]: Well, we have certain rights, like I said. I'm trying to find out whether there is a development down

there and whether we were disturbing anybody's privacy on being on the land exercising our rights. That's the relevancy.

[COURT]: Well, the question is, is there any development; is that right?

[DEFENDANT]: Is there any structures or any development down there on the property.

[COURT]: I'll allow the question.

[LOUISE]: No, there isn't any.

[DEFENDANT]: At the time of—on the restoration, was there any interference by or any members of the family?

[PROSECUTION]: Your Honor, I'm going to object as to relevance.

[COURT]: Objection sustained.

[DEFENDANT]: Okay. Do you feel your native rights were violated by this type of development of Mr. Galiher laying the fence line on the road to go down to the ocean?

[PROSECUTION]: Objection. Relevance.

[COURT]: Objection sustained.

. . .

[DEFENDANT]: At the time of my arrest, what was the reason for me going on top of the land?

[PROSECUTION]: I'm going to object, your Honor. It calls for speculation.

[COURT]: Objection sustained.

Following Hanapi's unsuccessful questioning, Hanapi testified on his own behalf. In a narrative form, Hanapi stated:

We are adjacent land owners. We're native tenants of the ahupua'a. We are also legal land owners and we enjoy the rights mandated by the state constitution, [a]rticle 12 and HRS [sections] 1–1 [and] 7–1 which allows us access for gathering reasons, for religious purpose and also to— we have—as native tenant we also have a moral responsibility and obligation to protect our natural resources. This is an undeveloped ahupua'a. We subsist in this ahupua'a, what I mean by subsisting is subsist off the water, the fishpond, the ocean, the springs[,] and also mauka side.

So, when this restoration was taking place the family was of course concerned that it would be done appropriately and done right, with respect.

. . .

[W]e went over to perform our religious and traditional ceremonies of healing the land. We shared that with Mrs. Billington, that we had to go over and start . . . to heal the land at that time. And that's what our total purpose was just to make sure that restoration was done properly.

. . .

So we as a kama'aina of the native peoples that lived in that area and have been there since ancient times, we know—we have knowledge of that area and how it was prior to the damage that was done. So we were offering our—we felt that it was our right to be there and to be included to make sure it was done right.

On cross-examination, Hanapi did not contest that he was on Galiher's property on the date he was arrested. He did not recall, however, Demello asking him to leave the property. The prosecutor then asked Hanapi if he was on Galiher's property exercising his gathering or religious rights. Hanapi responded affirmatively, stating that he was "gathering for religious purposes to start the healing of the land before the machines came in[.]"

At the close of trial, the district court convicted Hanapi of criminal trespass in the second degree and made the following oral findings:

[1.] There was no showing that the property is owned by anyone other than . . . Mr. Gary Galiher.

[2.] The charge of criminal trespass in the second degree specifically indicates that the person willingly [sic—knowingly] enters or remains unlawfully in or upon premises which are enclosed in a manner designed to [exclude] intruders or fenced.

[3.] The testimony [offered] was that the property on which Mr. Hanapi entered was fenced, that he was specifically asked to leave the premises. He did not leave and was arrested.

[4.] The definition of enters or remains unlawfully includes the fact that regardless of the person's intent, a person [who] enters or remains upon premises does so unless he defines [sic] a lawful owner [sic] not to enter or remain personally communicated to the person by the owner of the premises or by some other authorized person. And the owner of the property, Mr. Galiher, specifically indicated that Vernon Demello, his foreman, had the right to exclude people.

[5.] Mr. Demello also testified that he asked Mr. Hanapi to leave and he did not leave.

[6.] [T]here [was] no showing by the defendant that whatever rights he asserts as a native tenant which has been testified to only by his wife.

[7.] [T]here was no other showing that [Hanapi] is in fact a native tenant of that particular property beside[s] his own testimony and that of his wife.

[8.] [T]here is no showing also that he did enter for any religious or gathering purposes.

Accordingly, the district court fined Hanapi $100.00. Hanapi timely filed this appeal.

## II. STANDARDS OF REVIEW

### A. Evidentiary Rulings

[D]ifferent standards of review must be applied to trial court decisions regarding the admissibility of evidence, depending on the requirements of the particular rule of evidence at issue. When application of a particular evidentiary rule can yield only one correct result, the proper standard for appellate review is the right/wrong standard.

State v. Bates, 84 Hawai'i 211, 227, 933 P.2d 48, 64 (1997) (quoting Kealoha v. County of Hawai'i, 74 Haw. 308, 319, 844 P.2d 670, 676, reconsideration denied, 74 Haw. 650, 847 P.2d 263 (1993)). "This court reviews questions of relevancy, within the meaning of Hawai'i Rules of Evidence (HRE) Rules 401 . . . and 402 (1993)[,] under the 'right/wrong' standard, inasmuch as the application of those rules 'can yield only one correct result.'" State v. Wallace, 80 Hawai'i 382, 409,

910 P.2d 695, 722 (1996) (footnotes omitted) (quoting *Kealoha,* 74 Haw. at 319, 844 P.2d at 676).

### B. *Constitutional Right*

Additionally, Hanapi claims that he was asserting a constitutionally protected right at the time of his arrest. "We answer questions of constitutional law by exercising our own independent constitutional judgment based on the facts of the case. Thus, we review questions of constitutional law under the right/wrong standard." *State v. Mallan,* 86 Hawai'i 440, 443, 950 P.2d 178, 181 (1998) (quoting *State v. Arceo,* 84 Hawai'i 1, 11, 928 P.2d 843, 853 (1996) (internal quotation marks and citations omitted)).

### C. *Sufficiency of Evidence*

Where the defendant challenges the sufficiency of evidence supporting his or her conviction,

> [t]he test on appeal is not whether guilt is established beyond a reasonable doubt, but whether there was substantial evidence to support the conclusion of the trier of fact.... 'Substantial evidence' as to every material element of the offense charged is credible evidence which is of sufficient quality and probative value to enable a [person] of reasonable caution to support a conclusion. And [the] trier of fact ... is free to make all reasonable and rationale inferences under the facts in evidence, including circumstantial evidence.

*State v. Pulse,* 83 Hawai'i 229, 244, 925 P.2d 797, 812 (1996) (quoting *State v. Jackson,* 81 Hawai'i 39, 46, 912 P.2d 71, 78 (1996) (citations omitted)).

## III. *DISCUSSION*

### A. *The District Court Did Not Commit Reversible Error When It Excluded Evidence and Testimony Supporting Hanapi's Claimed Constitutional Right.*

The offense of criminal trespass in the second degree with which Hanapi was charged is defined in HRS § 708–814(1)(a) as "knowingly enter[ing] or remain[ing] unlawfully in or upon premises which are enclosed in a manner designed to exclude intruders or are fenced[.]" *See supra,* note 1. A person "'enters or remains unlawfully' in or upon premises when the person is not licensed, invited, or otherwise *privileged* to do so." HRS § 708–800 (1993) (emphasis added).

At trial, Hanapi essentially claimed he had a privilege, as a native Hawaiian, to remain lawfully on Galiher's property to engage in a constitutionally protected activity. In his brief, Hanapi characterizes his constitutionally protected native Hawaiian right as a defense to the charge of criminal trespass in the second degree. To establish this defense, Hanapi claims that he need only present "some credible evidence" to support his claim. Thereafter, Hanapi contends that the prosecution bore the burden of proving beyond a reasonable doubt facts negating his defense.

The prosecution does not object to this characterization. However, by construing Hanapi's claim of a constitutional right as a penal defense, the parties misapprehended their respective burdens of proof.

Generally, in a criminal case, the prosecution has the burden of proving all the elements of the offense *and* negating a defendant's statutorily defined defense, beyond a reasonable doubt. HRS § 702–205 (1993). The Hawai'i Penal Code (HPC) describes a defense as "a fact or set of facts which negatives penal liability." HRS § 701–115(1) (1993). When a penal defense is raised, the defendant has the initial burden "to come forward with some credible evidence of facts constituting the defense ...." Commentary on HRS § 701–115. Once a defendant establishes his or her prima facie defense, the burden then shifts to the prosecution to disprove the defense beyond a reasonable doubt. HRS § 701–115(2)(a).[5]

---

5. HRS § 701–115(2)(a) states in relevant part:
   (2) No defense may be considered by the trier of fact unless evidence of the specified fact or facts has been presented. If such evidence is presented then:

   > (a) If the defense is not an affirmative defense, the defendant is entitled to an acquittal if the trier of fact finds that the evidence, when considered in the light of any contrary

■ In contrast, the assertion of a constitutionally protected right presents a purely legal issue that must be determined by the court. *Cf.* Hawai'i Rules of Penal Procedure (HRPP) Rule 12(b)(3) (motions to suppress physical evidence and statements is a general issue of law for the judge to decide); *State v. Kelekolio,* 74 Haw. 479, 516–17, 849 P.2d 58, 75 ("[T]he admissibility of evidence is a question of law for the trial judge to determine.") (citing *Territory v. Buick,* 27 Haw. 28, 52 (1923)); HRE Rule 104(a) (1985) ("Preliminary questions concerning ... the admissibility of evidence shall be determined by the court."); *State v. Fukusaku,* 85 Hawai'i 462, 491, 946 P.2d 32, 61 (1997) (stating that "[i]ssues involving law ... are decided by a judge"). When a criminal defendant claims to have been engaged in a constitutionally protected activity, the burden is placed on him or her to show that his or her conduct fell within the prophylactic scope of the constitution's provision. *Cf. Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984).

In *Clark, supra,* the United States Supreme Court addressed the issue of "whether a National Park Service regulation prohibiting camping in certain parks violate[d] the First Amendment [of the United States Constitution] when applied to prohibit demonstrators from sleeping in Lafayette Park and the Mall in connection with a demonstration intended to call attention to the plight of the homeless." *Id.* at 289, 104 S.Ct. at 3067. Without expressly deciding whether overnight sleeping as part of a demonstration is expressive conduct protected by the First Amendment, the Supreme Court upheld the regulation as a reasonable time, place, or manner restriction that was content neutral and narrowly tailored to further the Government's substantial interest in maintaining the parks in an attractive and intact condition for the general public's enjoyment. *Id.* at 295–97, 104 S.Ct. at 3067–71. The Supreme Court further reasoned:

Although it is common to place the burden upon the Government to justify impingements on First Amendment interests, it is the obligation of the person desiring to engage in assertedly expressive conduct to demonstrate that the First Amendment even applied. To hold otherwise would be to create a rule that all conduct is presumptively expressive. In the absence of a showing that such a rule is necessary to protect vital First Amendment interests, we decline to deviate from that general rule that one seeking relief bears the burden of demonstrating that he is entitled to it.

*Id.* at 293 n. 5, 104 S.Ct. at 3069 n. 5.

Similarly, in *United States v. Powell,* 563 A.2d 1086, 1091 n. 8 (D.C.App.1989), the defendants were charged with unlawful entry for refusing to leave an area in the metrorail subway station that was to be closed for the night. The court stated that, in the District of Columbia:

When a person is charged ... with unlawful entry on public property, the government must prove some additional specific factor establishing the [person's] lack of a legal right to remain. Such factors may consist of posted regulations, signs, or *fences or barricades* regulating the public's use of government property.... The purpose of this requirement is to protect any First Amendment rights which may be implicated in the defendant's conduct, so that an individual's lawful presence is not conditioned upon the mere whim of a public official....

*Id.* at 1089 (emphasis in original). Although the Appeals Court did not directly address the issue whether there was sufficient evidence to show that the defendants were engaged in First Amendment activity,[6] the court noted that a person desiring to engage in assertedly expressive conduct must demonstrate that the conduct falls within the protections of the First Amendment. *Id.* at 1091 n. 8 (citing *Clark, supra,* and *Spence v.*

---

prosecution evidence, raises a reasonable doubt as to the defendant's guilt[.]

**6.** The court did not address this issue because it held that a pair of folding, accordion like gates

that enclosed the subject area constituted an additional specific factor establishing the defendants' lack of a legal right to remain on the property. *Id.* at 1091 n. 8.

*Washington,* 418 U.S. 405, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974)).

■ The *Clark* and *Powell* holdings are instructive. As a practical matter, it would be unduly burdensome to require the prosecution to negative any and all native Hawaiian rights claims regardless of how implausible the claimed right may be. "[T]o hold otherwise would be to create a rule that all conduct is presumptively [protected under the Constitution]." *Clark,* 468 U.S. at 293 n. 5, 104 S.Ct. at 3069 n. 5. We therefore hold that it is the obligation of the person claiming the exercise of a native Hawaiian right to demonstrate that the right is protected.

■ The preferred method for a defendant to raise a constitutional right in a criminal prosecution is by way of a motion to dismiss. *See* HRPP Rule 12(b) ("Any defense, objection or request which is capable of determination without the trial of the general issue may be raised before trial by motion."). *See also, e.g., Mallan,* 86 Hawai'i at 440, 950 P.2d at 178 (defendant claimed in a motion to dismiss that he had a right to smoke marijuana protected by art. I, section 6 of the Hawai'i Constitution); *Chung,* 75 Haw. at 398, 862 P.2d at 1063 (defendant filed a motion to dismiss his terroristic threatening charge on the ground that his statements were protected by the first amendment right of free speech and expression). In a bench trial, however, when the judge consolidates the motion to dismiss and the trial, he or she must make factual findings and legal conclusions on the constitutional issue separate and apart from the other substantive statutory elements of the offense.

In the instant case, because Hanapi appeared *pro se* at trial,[7] it is understandable that he failed to file a motion to dismiss. Nevertheless, the trial court begrudgingly allowed Hanapi to testify in support of his constitutional claims. The burden was squarely placed on Hanapi to prove that his conduct ought to have been accorded constitutional protection.

Article XII, section 7 of the Hawai'i Constitution expressly provides:

> The State reaffirms and shall protect all rights, customarily and traditionally exercised for subsistence, cultural and religious purposes and possessed by ahupua'a tenants who are descendants of native Hawaiians who inhabited the Hawaiian Islands prior to 1778, subject to the right of the State to regulate such rights.

This court has consistently recognized that "the *reasonable* exercise of ancient Hawaiian usage is entitled to protection under article XII, section 7." *Public Access Shoreline Hawai'i v. Hawai'i County Planning Comm'n,* 79 Hawai'i 425, 442, 903 P.2d 1246, 1263 (1995) (hereinafter *"PASH"*) (emphasis in original). *See also Kalipi v. Hawaiian Trust Co., Ltd.,* 66 Haw. 1, 656 P.2d 745 (1982) (recognizing Hawaii's constitutional mandate to protect traditional and customary native Hawaiian rights); *Pele Defense Fund v. Paty,* 73 Haw. 578, 620, 837 P.2d 1247, 1272 (1992) (upholding the *"Kalipi* rights" defining the "rudiments of native Hawaiian rights protected by article XII, § 7" of the Hawai'i Constitution). In *PASH,* we further examined the legal developments of land tenure in Hawai'i and concluded that "the issuance of a Hawaiian land patent confirmed a limited property interest as compared with typical land patents governed by western concepts of property." *Id.*

■ Although *PASH* did not discuss the precise nature of Hawaii's "limited property interest," one limitation would be that constitutionally protected native Hawaiian rights, reasonably exercised, qualify as a privilege for purposes of enforcing criminal trespass statutes.

In the instant case, Hanapi attempted to meet his burden of proof by requesting that

---

7. "A jury trial was not required for the charge of criminal trespass in the second degree because it is a petty misdemeanor punishable by a thirty-day maximum term of imprisonment." *State v. Sadler,* 80 Hawai'i 372, 374, 910 P.2d 143, 145 (App.1996) (citing HRS §§ 708–814(1)(b) (1993), 708–814(2) (1993), and 706–663 (1993)). *See also State v. Lindsey,* 77 Hawai'i 162, 165, 883 P.2d 83, 86 (1994) (ruling that, "if the maximum authorized term of imprisonment for a particular offense does not exceed thirty days, it is presumptively a petty offense to which the right to a jury does not attach.").

the district court allow him to introduce: (1) evidence and testimony relating to the COE's finding of a wetlands violation on Galiher's property; and (2) Louise Hanapi's testimony concerning the native Hawaiian rights asserted by Hanapi at the time of his arrest.

As a general rule, "[a]ll relevant evidence is admissible.... Evidence which is not relevant is not admissible." HRE Rule 402. HRE Rule 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

As to Hanapi's claim that the district court erred in excluding evidence of a wetlands violation on Galiher's property, a review of the trial transcripts reveals that Hanapi clearly testified to a wetlands violation on the property:

> There was something that Mr. Galiher and Ms. Hono had—were found in violation of the wetlands area; in other words, they filled in this area which had fish living in there at the time[.]

Hanapi also elicited testimony from Galiher, Demello, and his wife concerning the wetlands violation. Despite these testimonies, Hanapi claims that the court erred in excluding further detailed evidence of a wetlands violation which was relevant to "establish[ ] the nature, scope and circumstances of [Hanapi's] native Hawaiian rights[.]" We disagree.

The court permitted Hanapi to offer evidence that he was on Galiher's property due to a wetland's violation. Hanapi testified that his purpose for being on Galiher's property was "to participate in [the wet lands] restoration as [a] monitor[ ] and consultant[ ]." Any further details of the wetlands violation were of no consequence to Hanapi's claimed native Hawaiian right. Accordingly, the district court correctly excluded additional evidence of a wetlands violation as irrelevant.

Next, Hanapi contends that the district court excluded, as irrelevant, testimonial evidence tending to support his claim that he had a privilege, as a native Hawaiian, to be

on Galiher's property to engage in a constitutionally protected activity. Without this evidence, Hanapi appears to argue that the court could not have concluded that he was not exercising a protected constitutional right at the time of his arrest. The record indicates that Hanapi advised the court that he was "trying to establish [his] rights [as a native tenant] ... on the land regardless of whether Mr. Galiher ... owned it or not[.]" Thereafter, the district court dismissed Hanapi's constitutional claim as a "[c]ircuit [c]ourt matter" unrelated to his trespass charge. Despite this initial ruling, the district court permitted Hanapi to substantiate his claimed constitutionally protected right by eliciting testimony that: (1) he was a native Hawaiian ahupua'a tenant; (2) he had "a moral responsibility and obligation to protect our natural resources[;]" (3) the property he was on at the time of his arrest was undeveloped; and (4) he was on Galiher's property to "perform ... religious and traditional ceremonies of healing the land[,]" and "make sure the restoration was done properly." This being the case, we can discern no prejudice to Hanapi's substantial rights as a result of the district court's initial rejection of his claimed constitutional privilege to be on Galiher's property. We therefore hold that the court's errors were harmless.

B. *Hanapi Failed To Establish That His Claimed Native Hawaiian Right Was a Customary and Traditional Practice, and There Was Sufficient Evidence in the Record To Sustain His Conviction.*

Hanapi's second point of error asserts that there was insufficient evidence to support a conclusion that he knowingly entered or remained unlawfully on Galiher's property in violation of HRS § 708–814(1)(a). In particular, Hanapi contends that he presented credible evidence establishing that he was exercising a constitutionally protected native Hawaiian right at the time of his arrest, and "the trial court was compelled as a matter of law to acquit [him]."

In order for a defendant to establish that his or her conduct is constitutionally protected as a native Hawaiian right, he or she must

show, at minimum, the following three factors. First, he or she must qualify as a "native Hawaiian" within the guidelines set out in *PASH*. *PASH* acknowledged that the terms "native," "Hawaiian," or "native Hawaiian" are not defined in our statutes, or suggested in legislative history. *PASH*, 79 Hawai'i at 449, 903 P.2d at 1270. *PASH* further declined to endorse a fifty percent blood quantum requirement as urged by the plaintiffs. *Id.* at 448, 903 P.2d at 1269. Instead, *PASH* stated that "those persons who are 'descendants of native Hawaiians who inhabited the islands prior to 1778,' and who assert otherwise valid customary and traditional Hawaiian rights are entitled to [constitutional] protection *regardless of their blood quantum*." *Id.* at 449, 903 P.2d at 1270 (quoting Haw. Const. art. XII, § 7) (emphasis added).[8]

■ Second, once a defendant qualifies as a native Hawaiian, he or she must then establish that his or her claimed right is constitutionally protected as a customary or traditional native Hawaiian practice. Some customary and traditional native Hawaiian rights are codified either in art. XII, section 7 of the Hawai'i Constitution or in HRS §§ 1–1 and 7–1 (1993).[9] The fact that the claimed right is *not* specifically enumerated in the Constitution or statutes, does not preclude further inquiry concerning other traditional and customary practices that have existed. *Id.* at 438, 903 P.2d at 1259.

■ Finally, a defendant claiming his or her conduct is constitutionally protected must also prove that the exercise of the right occurred on undeveloped or "less than fully developed property." *Id.* at 450, 903 P.2d at 1271. In *PASH*, we reaffirmed the *Kalipi* court's nonstatutory "undeveloped land" requirement. *Id.* We noted that "the *Kalipi* court justified the imposition of ... [such a requirement] by suggesting that the exercise of traditional gathering rights on fully developed property 'would conflict with our understanding of the traditional Hawaiian way of life in which *cooperation and non-interference with the wellbeing of other residents were integral parts of the culture.*'" *Id.* (quoting *Kalipi* 66 Haw. at 9, 656 P.2d at 750 (emphasis in original)). We also acknowledged that "[d]epending on the circumstances of each case, once land has reached the point of 'full development' it *may* be inconsistent to allow or enforce the practice of traditional Hawaiian gathering rights on such property." *Id.* (emphasis added). Our intention in *PASH* was to examine the degree of development of the property, including its current uses, to determine whether the exercise of constitutionally protected native Hawaiian rights on the site would be inconsistent with modern reality. To clarify *PASH*, we hold that if property is deemed "fully developed," i.e., lands zoned and used for residential purposes with existing dwell-

8. In *PASH*, we also reserved the right to comment on the questions of (1) "whether descendants of citizens of the Kingdom of Hawai'i who *did not* inhabit the islands prior to 1778 may also assert customary and traditional rights[;]" and (2) whether "non-Hawaiian" members of an "ohana" may legitimately claim native Hawaiian rights. *Id.* at 449 n. 41, 903 P.2d at 1270 n. 41. Here, because Hanapi represented that he was a native Hawaiian ahupua'a tenant, we do not reach the issues left open in footnote 41.

9. HRS § 1–1 states:

The common law of England as ascertained by English and American decisions, is declared to be the common law of the State of Hawai'i in all cases, except as otherwise provided by the Constitution or laws of the United States, or by the laws of the State, or fixed by Hawaiian judicial precedent, or established by *Hawaiian usage;* provided that no person shall be subject to criminal proceedings except as provided by

the written laws of the United States of the State.

(Emphasis added).

HRS § 7–1 states:

Where landlords have obtained, or may hereafter obtain, allodial titles to their lands, the people on each of their lands shall not be deprived of the right to take firewood, house-timber, aho cord, thatch, or ki leaf, from the land on which they live, for their own private use, but they shall not have the right to take such articles to sell for profit. The people shall also have the right to drinking water, and roads shall be free to all on all lands granted in fee simple; provided that this shall not be applicable to well and watercourses, which individuals have made for their own use.

Together, HRS §§ 1–1 and 7–1 represents the codification of traditional and customary native Hawaiian rights which provide the basis for a claim of a constitutionally protected native Hawaiian right.

ings, improvements, and infrastructure,[10] it is *always* "inconsistent" to permit the practice of traditional and customary native Hawaiian rights on such property. In accordance with *PASH*, however, we reserve the question as to the status of native Hawaiian rights on property that is "less than fully developed." *Id.* at 450, 903 P.2d at 1271.

In this case, it is uncontroverted that Hanapi is a "descendant[ ] of native Hawaiians who inhabited the islands prior to 1778." Thus, the primary issue is whether Hanapi *proved* that his conduct, at the time of his arrest, represented the exercise of a traditional or customary native Hawaiian right deserving of constitutional protection.[11]

■ At trial, Hanapi adduced no evidence establishing "stewardship" or "restoration and healing of lands" as an ancient traditional or customary native Hawaiian practice. Instead, Hanapi reiterated his responsibility and sense of obligation to the land, as a native Hawaiian tenant, to justify his privileged access to Galiher's property. This evidence assumed, rather than established, the existence of a protected customary right. *See PASH*, 79 Hawai'i at 449, 903 P.2d at 1270 (specifying that, " 'usage must be based on actual practice' and not assumptions or conjecture") (quoting *State v. Zimring*, 58 Haw. 106, 117, 566 P.2d 725, 733 (1977)).

■ To establish the existence of a traditional or customary native Hawaiian practice,

we hold that there must be an adequate foundation [12] in the record connecting the claimed right to a firmly rooted traditional or customary native Hawaiian practice. Here, Hanapi did not offer any explanation of the history or origin of the claimed right. Nor was there a description of the "ceremonies" involved in the healing process. Without this foundation, the district court properly rejected, albeit inartfully, Hanapi's claim of constitutional privilege.

Inasmuch as Hanapi failed to adduce sufficient evidence to support his claim of constitutional privilege, we must next decide whether substantial evidence existed in the record to support Hanapi's conviction of criminal trespass in the second degree.

■ As noted earlier, HRS § 708–814(1) states that "a person commits the offense of criminal trespass in the second degree if . . . [t]he person knowingly enters or remains unlawfully in or upon premises which are enclosed in a manner designed to exclude intruders or are fenced[.]" The facts in this case reveal that: (1) Galiher's property was fenced in a manner to exclude intruders; (2) Hanapi knowingly entered Galiher's property on the date of his arrest; and (3) when Galiher's foreman, Demello, ordered Hanapi off the property, he refused to leave. Based on these facts, the judge, as the trier of fact, had sufficient evidence to conclude that Ha-

---

10. We cite property used for residential purposes as an example of "fully developed" property. There may be other examples of "fully developed" property as well where the existing uses of the property may be inconsistent with the exercise of protected native Hawaiian rights.

11. Despite Hanapi's uncontested testimony that Galiher's property was undeveloped, we need not discuss the degree of development on Galiher's property because the dispositive issue in the instant case is based on the constitutionality of Hanapi's claimed native Hawaiian right.

12. A defendant may lay an adequate foundation by putting forth specialized knowledge that the claimed right is a traditional or customary native Hawaiian practice. This specialized knowledge may come from expert testimony, pursuant to HRE Rule 702 (1993). HRE Rule 702 states:

   **Testimony by experts.** If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to

determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise. In determining the issue of assistance to the trier of fact, the court may consider the trustworthiness and validity of the scientific technique or mode of analysis employed by the proffered expert.

   In this jurisdiction, we have also accepted kama'aina witness testimony as proof of ancient Hawaiian tradition, custom, and usage. *See Palama v. Sheehan*, 50 Haw. 298, 440 P.2d 95 (1968) (holding that testimony from kama'aina witnesses were sufficient to find the existence of an ancient Hawaiian right of way); *Application of Ashford*, 50 Haw. 314, 316, 440 P.2d 76, 78, *reh'g denied*, 50 Haw. 452, 440 P.2d 76 (1968) (recognizing that Hawai'i "allow[s] reputation evidence by kama'aina witnesses in land disputes"); *In re Boundaries of Pulehunui*, 4 Haw. 239 (1879) (permitting kama'aina witnesses to testify about the location of ancient Hawaiian land boundaries).

napi was unlawfully on Galiher's property, in violation of HRS § 708–814(1).

## IV. *CONCLUSION*

For the above reasons, we affirm Hanapi's conviction of and sentence for criminal trespass in the second degree.