**Electronically Filed
Supreme Court
SCWC-27897
29-MAY-2012
12:32 PM**

IN THE SUPREME COURT OF THE STATE OF HAWAIʻI

---o0o---

STATE OF HAWAIʻI, Respondent/Plaintiff-Appellee,

vs.

LLOYD PRATT, Petitioner/Defendant-Appellant.

NO. SCWC-27897

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(ICA NO. 27897; CR. NO. HC 04-147)
(ICA NO. 27898; CR. NO. HC 04-169)
(ICA NO. 27899; CR. NO. HC 04-229)

MAY 29, 2012

RECKTENWALD, C.J., NAKAYAMA, AND DUFFY, JJ.,
WITH ACOBA, J., CONCURRING AND DISSENTING,
WITH WHOM MCKENNA, J., JOINS

<u>AMENDED OPINION OF THE COURT BY NAKAYAMA, J.</u>

Article XII § 7 of the Hawaiʻi Constitution provides:

> The State reaffirms and shall protect all rights,
> customarily and traditionally exercised for subsistence,
> cultural and religious purposes and possessed by ahupuaʻa
> tenants who are descendants of native Hawaiians who
> inhabited the Hawaiian Islands prior to 1778, subject to the
> right of the State to regulate such rights.

Haw. Const. art. XII, § 7.  Over the course of several cases,

this court has interpreted this provision, along with statutory sources of protections, in order to define the scope of the legal privilege for native Hawaiians to engage in customary or traditional native Hawaiian practices when such practices conflict with State statutes or regulations. The court has examined the privilege in the civil context, considering the right to enter private land to gather traditional plants (Kalipi v. Hawaiian Trust Co., Ltd., 66 Haw. 1, 656 P.2d 745 (1982)), the right to contest the State's sale of "ceded" lands (Pele Defense Fund v. Paty ("PDF"), 73 Haw. 578, 837 P.2d 1247 (1992)), and the right to participate in county-level Planning Commission hearings regarding land use (Public Access Shoreline Hawaii v. Hawaii County Planning Comm'n ("PASH"), 79 Hawai'i 425, 903 P.2d 1246 (1995)). The court has also examined this privilege in the criminal context. In our most recent case on this topic, State v. Hanapi, 89 Hawai'i 177, 970 P.2d 485 (1998), we held that a criminal defendant asserting this privilege as a defense to criminal charges must satisfy, "at minimum", the following three-prong test: (1) the defendant must be "native Hawaiian" according to the criteria established in PASH[1], (2) the claimed right must be "constitutionally protected as a customary or traditional native Hawaiian practice," and (3) the conduct must occur on

_____

[1] PASH defines "native Hawaiians" as "descendants of native Hawaiians who inhabited the islands prior to 1778[.]" PASH, 79 Hawai'i 425, 449, 903 P.2d 1246, 1270 (1995).

2

undeveloped property.  Id. at 185-86, 970 P.2d at 493-94.  In that case, we held that Hanapi had not satisfied this test, so the court's analysis stopped there.  Id. at 187, 970 P.2d at 495.

Today's case picks up where Hanapi left off, and requires the court to articulate the analysis the courts must undertake when a defendant has made the "minimum" showing from Hanapi.  The defendant in this case, Lloyd Pratt, received three citations[2] when he was found residing in a closed area of Nā Pali State Park on the island of Kaua'i.  Pratt filed a motion to dismiss the charges, asserting as a defense that his activities were constitutionally-protected native Hawaiian practices, and citing Hanapi.  The District Court of the Fifth Circuit ("trial court") denied his motion[3], held trial, and subsequently found Pratt guilty on all three charges.  Pratt appealed to the Intermediate Court of Appeals ("ICA"); the ICA affirmed Pratt's conviction.  State v. Pratt, 124 Hawai'i 329, 243 P.3d 289 (App. 2010).  Pratt applied for a writ of certiorari, and we granted his application to clarify the law surrounding the assertion of native Hawaiian rights as a defense in criminal cases.[4]

## I.  BACKGROUND

---

[2]  The three cases (numbers 27897, 27898, and 27899) were consolidated into one case.

[3]  The Honorable Frank D. Rothschild presided.

[4]  Pratt's application for writ of certiorari presented a second question regarding the binding effect of a concession on appellate courts. Because the court is able to decide the case without resolving that question, the question is not discussed.

Pratt was cited for violating Hawai'i Administrative Rules ("HAR") § 13-146-4 on July 14, July 28, and September 28 of 2004, when he was found in a closed area of the Kalalau Valley in the Nā Pali Coast State Wilderness Park on Kaua'i. HAR § 13-146-4, Closing of Areas, states in pertinent part:

> The board [of land and natural resources] or its authorized representative may establish a reasonable schedule of visiting hours for all or portions of the premises and close or restrict the public use of all or any portion thereof, when necessary for the protection of the area or the safety and welfare of persons or property, by the posting of appropriate signs indicating the extent and scope of closure. All persons shall observe and abide by the officially posted signs designating closed areas and visiting hours.

HAR § 13-146-4(a) (1999).

A.    **Trial Proceedings**

On September 21, 2005, Pratt filed a motion to dismiss arguing that the activity for which he received his citations is constitutionally privileged as a native Hawaiian practice.[5] At a hearing on Pratt's motion, the defense presented two witnesses: Pratt, and Dr. Davianna Pomaika'i McGregor, a professor of Ethnic Studies at the University of Hawai'i, Mānoa. The prosecution presented one witness: Wayne Souza, the Parks District Superintendent for Kaua'i for the Department of Land and Natural Resources.

Pratt testified that he was born in Waimea to parents from O'ahu and the island of Hawai'i. He presented a family tree

---

[5]     In Hanapi, the court explained that "[t]he preferred method for a defendant to raise a constitutional right in a criminal prosecution is by way of a motion to dismiss." Hanapi at 184, 970 P.2d at 492.

4

and testified that he is 75% native Hawaiian.  Pratt named Kupihea as a family line, though that name does not appear on his family tree.  The defense then presented its Exhibit 4, a book published by the State of Hawai'i called "An Archaeological Reconnaissance Survey: Na Pali Coast State Park, Island of Kaua'i."  The book lists a land grant sold to the Kupihea family for part of the ahupua'a for the Kalalau Valley.  Pratt testified that this is his family's land, and that this is where he spends time in the Park.

Pratt learned huna, which he described as a native Hawaiian "spiritual living style" from two elders.  Pratt is a kahu, which he translated as a minister, healer, or medicine man. In addition to healing people, Pratt described his practice of healing land:

> It's actually putting back into order again.  But it was there by my ancestors because it has mana[6] in it. It's to clean up the rubbish that is in there, meaning it broke up the mana that is on the heiaus[7], and especially because my ancestors are all buried on it. They're the caretakers to it.

Pratt testified that he has practiced such healing in the Kalalau Valley approximately each month for over thirty years, and that he is responsible for the Kalalau Valley because his ancestors are buried there.

---

[6]     "Mana" means "Supernatural or divine power." Mary Kawena Pukui & Samuel H. Elbert, Hawaiian Dictionary 235 (rev. ed. 1986).

[7]     A "heiau" is defined as "a Pre-Christian place of worship, shrine; some heiau were elaborately constructed stone platforms, others simple earth terraces.  Many are preserved today."  Pukui & Elbert, Hawaiian Dictionary 64.

Pratt said that he takes offense when people say he "camps" in Kalalau Valley because he actually lives there. Pratt testified that he has to spend the night in the valley to fulfill his responsibilities because hiking in to the valley takes eight to ten hours, and he needs two days to recuperate from the difficult hike. The defense offered a photograph as its Exhibit 2, which shows the area where Pratt lived. Pratt explained that he cleared the area in the picture of trash, brush, and overgrown java plum trees, an invasive species that prevents native plants from growing. He planted hasu, watercress, bananas, and twelve coconut trees. Exhibit 2 shows several tarps, which Pratt said covered his living area; it also shows a green hose, which Pratt used to water his plants. Pratt said that he knew of a government program whereby a private citizen can work with the DLNR to take care of the parks; he unsuccessfully applied to work with this program in Kalalau Valley in the early 1990s.

Dr. Davianna Pomaika'i McGregor is a tenured professor at the University of Hawai'i where she teaches classes on Hawaiians, land tenure use in Hawai'i, race relations, and economic change in Hawaii's people. She has taught the course on Hawaiians since 1974. Dr. McGregor testified as an expert in the area of customary and traditional native Hawaiian practices, as well as the source of protection of native Hawaiian rights.

Through her research, Dr. McGregor has developed a list

of the following six elements essential to traditional and customary native Hawaiian practices: (1) the purpose is to fulfill a responsibility related to subsistence, religious, or cultural needs of the practitioner's family; (2) the practitioner learned the practice from an elder; (3) the practitioner is connected to the location of practice, either through a family tradition or because that was the location of the practitioner's education; (4) the practitioner has taken responsibility for the care of the location; (5) the practice is not for a commercial purpose; and (6) the practice is consistent with custom. In preparation for her testimony, Dr. McGregor interviewed Pratt and determined that his daytime activities in Kalalau Valley meet these requirements of a traditional and customary practice. She testified that Pratt's activities are subsistence-related because he planted food plants, that they are religious because he performs ceremonies on the heiau, and that they are cultural because he learned them from the previous generations. Based on her interview with Pratt, Dr. McGregor believed that Pratt's activities satisfied every element of her test: Pratt learned the practices from elders, his ancestors lived in Kalalau Valley, he took responsibility for the Valley, his purpose was not commercial, and his practices were consistent with custom. Dr. McGregor further opined that Pratt's residence in the valley is a traditional practice because it was necessary to fulfill his

responsibilities to the land. McGregor testified that she believed these practices to be protected by Hawaiʻi law.

Mr. Wayne Souza, the Parks District Superintendent for Kauaʻi for the Department of Land and Natural Resources ("DLNR"), testified for the prosecution. He stated that the purpose of the park regulations is to limit the number of people permitted in the park for health and safety reasons, and to protect vulnerable park resources. Souza testified that controlling the number of visitors is necessary because the self-composting toilets fail when too many people visit. The regulations also limit the number of people who visit in order to keep the area "low density" to provide a wilderness experience, and to protect plant and animal life. He testified that the park is home to native plant communities and native sea birds. Souza also testified that the State has established a curatorship program to manage cultural and archaeological resources, like the heiau in Kalalau Valley. Under the program, a curator works with the DLNR and the State Historic Preservation Division to manage the sites.

Following the hearing, the parties submitted briefing on the issue of the native Hawaiian practices defense. In its brief, the State conceded the following:

> In this case, based on Dr. Davianna Pomaikai McGregor's testimony, the State does not dispute that the activities described are traditional and customary Native Hawaiian practices.

The State argued that, even if Pratt's conduct is a native

8

Hawaiian practice, Pratt's right to engage in this practice is subject to the State's right to regulate. The State maintained that it is entitled to enforce its regulations restricting visitation of Kalalau Valley to protect the health and safety of the public, and to preserve the natural environment. The State also cited the curatorship program as an effort by the State to reconcile competing interests in managing the Park.

In his brief, Pratt contended that his motion to dismiss should be granted because he satisfied the three prongs of the Hanapi test.[8] Alternatively, Pratt argued that, while the State may regulate even customary and traditional practices, the State has the burden to prove that the regulation is reasonable and allows for the practice of native Hawaiian rights to the extent feasible. Pratt suggested that if the court applies a balancing test, that test should only permit the State to regulate if it shows that it would be "infeasible" to permit the native Hawaiian practice; Pratt argued that because the State has not made such a showing, the defense stands as a bar to conviction.

The trial court recognized that there was no dispute regarding whether Pratt satisfied the three prongs of the Hanapi test, but determined that further analysis was required. The trial court noted that the constitutional provision at issue

[8] Pratt also briefed a defense under the Federal Religious Freedom Restoration Act ("RFRA"), but that defense is not before this court.

explicitly states that the privilege is "subject to the right of the State to regulate such rights"; therefore the court determined that when a defendant claims a native Hawaiian privilege as a defense to criminal charges, the court must consider the State's interests in regulating the conduct. The trial court found that the State has a strong interest in controlling the Park, and that Pratt could exercise his rights within the boundaries of the law by obtaining permits to be in the park or applying to the curatorship program. In sum, the court found:

> that the State has a valid interest in protecting and preserving this valuable asset [the park], which means, among other things, controlling the amount of traffic, the length of stay for any one person, and the types of activities that are consistent with this stewardship. This interest when balanced against the rights expounded by Mr. Pratt weigh in favor of the State.

The trial court denied Pratt's motion to dismiss, and allowed the case to proceed to trial.

At trial, the parties stipulated to the essential facts sufficient to establish that Pratt had violated the Closed Areas regulation. The stipulation also permitted the trial court to treat the testimony from the hearing on the motion to dismiss as the testimony offered at trial. The document states the following:

> The STATE OF HAWAII and Defendant LLYOD [sic] PRATT stipulate that the following facts are true, accurate and correct.
> On July 14, 2004, July 28, 2004 and September 28, 2004, Lloyd Pratt was camping in Kalawao [sic] State Park.
> At each of the times that Lloyd Pratt was camping the Kalalau State Park location where he was camping was a closed area[.]

10

> Prior to each of the times when Lloyd Pratt camping [sic] in Kalalau State Park signs were posted stating that locations where Lloyd Pratt was camping was [sic] a closed area.
> Immediately prior to each of the times when camping, Lloyd Pratt, [sic] both saw the signs and had actual knowledge that the locations in Kalalau State Park where he was camping was [sic] a closed area.
> And that all times relevant, the entirety of Kalalau State Park was located in the County of Kauai, State of Hawaii.
> Additionally, the STATE OF HAWAII and LLYOD [sic] PRATT stipulate that the testimony contained in the November 4, 2005 transcript of proceedings shall be deemed to have been given at trial and that any objections and rulings thereon shall be deemed to have been as set forth in that transcript. This stipulation shall not constitute a waiver of any of the objections to or claims of error that either the STATE OF HAWAII or LLYOD [sic] PRATT may choose assert [sic] with respect to any rulings on objections or other orders of court as set forth in said transcript.

In its closing argument the State reiterated its position that if its regulations are reasonable, then the native Hawaiian privilege does not exempt anyone from compliance with those regulations. Pratt presented multiple defenses: he reiterated his position that he had satisfied the Hanapi test, and he presented several other defenses, arguing that a conviction would violate the Federal Religious Freedom Restoration Act ("RFRA"), the ex post facto clauses of the federal and state constitutions, the rule of lenity, and stare decisis.[9]

The trial court convicted Pratt of violating the Closed Areas regulation. The trial court's order included the following Findings of Fact ("FOF") and Conclusions of Law ("COL"):

> [FOF] 13. Based on the testimony elicited at the November 4

---

[9] Pratt does not pursue the RFRA, ex post facto, or stare decisis claims in his application for writ of certiorari, thus, this opinion does not fully articulate these arguments. Pratt's argument as to the rule of lenity is reviewed in Section III.B., infra.

hearing and concessions made by the State in its brief, the Court finds that Mr. Pratt is [1] a native Hawaiian, [2] that he carried out customary or traditional native Hawaiian practices in Kalalau at the time of the camping, and [3] that this exercise of rights occurred on undeveloped or less than fully developed land.

[. . .]

[FOF] 16.  At trial, the parties stipulated that the evidence and issues offered at the hearing on the Motion to Dismiss were deemed to have been introduced at trial.

[. . .]

[COL] 4.  The rights of Native Hawaiians to engage in customary or traditional Native Hawaiian practices, carried out on land that was undeveloped or less than fully developed, is not an absolute right, but is a right that needs to be balanced against the interest of the State of Hawaii in keeping the Kalalau State Park a wilderness area, protecting the area for all to enjoy, conserving park resources and providing for the health and safety of all who visit the area.

[. . .]

[COL] 6.  DLNR Code LNR 13-146-04 is a reasonable regulation, both on its face and as applied to the heretofore described activities of Lloyd Pratt.

[. . .]

[COL] 8.  The defendant satisfied all three prongs of the affirmative defense as set forth in State v. Hanapi.

[COL] 9.  Case and statutory law all suggest that even with such a showing (under Hanapi), the Court must "reconcile competing interests," or stated another way "accommodate competing...interests" and only uphold such rights and privileges "reasonably exercised" and "to the extent feasible" and "subject to the right of the State to regulate such rights."  See Article XII, section 7, Hawaii Constitution; Public Access Shoreline Hawaii v. Hawaii County Planning Commission, 79 Hawaii 425 (1995).

[COL] 10.  The Court must balance the competing interests of Mr. Pratt's attempts to exercise certain Hawaiian native [sic] rights by setting up a residence and [heiau] in the Kalalau Valley with the State's interest in keeping this a wilderness area for all to enjoy and be safe in.

[COL] 11.  The Court finds that the State has a valid interest in protecting and preserving this valuable asset, which means, among other things, controlling the amount of traffic, the length of stay for any one person, and the types of activities that are consistent with this stewardship.  This interest when balanced against the rights expounded by Mr. Pratt weigh in favor of the State.

12

The court sentenced Pratt to 60 hours of community service, and stayed the sentence pending this appeal.

## B.   The ICA's November 18, 2010 Opinion

Pratt appealed his conviction to the ICA.  The three ICA judges produced three separate published opinions.  State v. Pratt, 124 Hawaiʻi 329, 243 P.3d 289 (App. 2010).  Though they based their opinions on different reasoning, Judges Fujise and Leonard both concluded that Pratt's conviction should be affirmed.  Chief Judge Nakamura concurred in part, but dissented from the portion of the opinion affirming Pratt's conviction.  On December 17, 2010, the ICA filed its Judgment on Appeal.  On March 15, 2011, Pratt filed a timely application for writ of certiorari.  This court accepted Pratt's application on April 21, 2011 and heard oral argument on May 19, 2011.

## II.   STANDARD OF REVIEW

Pratt asserts a constitutional right.  "We answer questions of constitutional law by exercising our own independent constitutional judgment based on the facts of the case.  Thus, we review questions of constitutional law under the right/wrong standard."  Hanapi, 89 Hawaiʻi at 182, 970 P.2d at 490 (quoting State v. Mallan, 86 Hawaiʻi 440, 443, 950 P.2d 178, 181 (1998)) (internal quotations marks and citations omitted).

## III.  DISCUSSION

**A.   The Court Will Not Exercise Plain Error Review To Invalidate The Parties' Stipulation At Trial**.

In this case, as in any criminal case, the burden of proof falls on the prosecution to prove each element of the crime for which the defendant is charged.  It is only after the prosecution meets this burden that any offered affirmative defense becomes relevant.  In this case, Pratt stipulated to all the essential facts necessary to warrant conviction.  Therefore, this court must affirm the judgment below convicting Pratt, unless Pratt can prove his defense that the privilege for native Hawaiian practices applies in his case.

The dissent argues that the court should exercise plain error review to invalidate Pratt's conviction on grounds not raised by counsel, namely, that the court may not accept the stipulation agreed upon by Pratt and the prosecution in this case.  The dissent reasons that because there is no on-the-record colloquy in which Pratt waives his right to have the prosecution prove each element of the offense for which he was charged, and because Pratt and defense counsel contradicted the stipulation on record, the case must be remanded for a new trial.  Dissent at 20-22.  The dissent cites as authority State v. Murray, 116 Hawai'i 3, 169 P.3d 955 (2007), a case which had not been decided at the time of Pratt's trial.

We respectfully disagree with the dissent's position

14

for several reasons.  First, we note that the timing of the stipulation and Pratt's testimony indicate that the stipulation reflected a tactical decision not to dispute whether the prosecution satisfied its burden to secure conviction.  The first step of Pratt's defense was to file a motion to dismiss, grounded in his affirmative defense that his activities in the park were protected as traditional and customary native Hawaiian practices, and that such protection precluded conviction.  The District Court held a hearing on Pratt's motion on November 4, 2005.  It was during this hearing that Pratt testified that he had not seen any "Closed Area" signs in the park.  Following further briefing on the defense, the court issued an order denying Pratt's motion on March 10, 2006, and the case was scheduled for trial.  Prior to trial on April 12, 2006, the parties executed a stipulation to satisfy the essential facts of the offense, thus narrowing the issues for trial to Pratt's several affirmative defenses.  Pratt signed the stipulation, as did defense counsel and the prosecution.

The dissent would negate the parties' April 2006 stipulation, in part due to Pratt's November 2005 testimony that he did not see any of the posted signs in the park.  However, the subsequent stipulation indicates that, at trial, the defense made a tactical decision to focus its energy on affirmative defenses,

15

rather than disputing the prosecution's prima facie case.[10]  The dissent would also negate the stipulation because the record does not include any physical evidence of the signs.  However, the absence of evidence to prove an element to which the opposing party has stipulated is to be expected; having executed the stipulation, the prosecution did not present its case in chief at trial.

The dissent cites State v. Murray as authority for discarding the stipulation.  In Murray, the defendant was on trial for Abuse of a Family or Household Member.  116 Hawaiʻi at 5, 169 P.3d at 957.  More specifically, prosecutors sought conviction under a subsection of the statute for defendants convicted of a "third or any subsequent offense that occurs within two years of a second or subsequent conviction."  Id.  In a motion in limine, defense counsel stipulated to the prior abuse convictions; this stipulation was read aloud to the jury at trial.  Id.  On writ, the court considered whether this stipulation was in error because it was "made solely by counsel."  Id. at 6, 169 P.3d at 958.  The court concluded that Murray was entitled to a new trial because his counsel was not permitted to make this stipulation without Murray's consent.  Id. at 14, 169

---

[10]  The dissent cites Briones v. State, 74 Haw. 442, 848 P.2d 699 (1993), for support of its argument that declining to refute the charges can not be tactical because it did not have an "obvious basis" in benefitting Pratt.  Dissent at 12-13 n.4.  Respectfully, this argument takes a myopic view of Pratt's case.  From the very beginning, Pratt sought to establish a constitutional privilege to camp or reside in Kalalau Valley without a permit.

16

P.3d at 966. For support, the court cited State v. Ibuos, 75 Haw. 118, 121, 857 P.2d 576, 578 (1993) for the proposition that "A knowing and voluntary waiver [. . .] must come directly from a defendant, either in writing or orally." Id. at 10, 169 P.3d at 962 (emphasis added). The court explained the requirement that the waiver be on the record, reasoning that "[w]ithout such a record it is difficult to determine whether the defendant personally waived such a right." Id. at 12, 169 P.3d at 964.

This main concern informing Murray is not present in Pratt's case because Pratt is on the record as personally admitting to the essential facts supporting conviction. The record in this case contains a written stipulation, signed by Pratt himself. With respect, we do not believe that the court should exercise plain error review to retroactively apply Murray when the concern addressed by Murray is not a factor. See, e.g., State v. Kelekolio, 74 Haw. 479, 515, 849 P.2d 58, 74 (1993) ("This court's power to deal with plain error is one to be exercised sparingly and with caution. . . ."). Furthermore, the contradictions on the record from Pratt's testimony were offered prior to the stipulation, and the fact that the record does not contain evidence of the signs is not unexpected, as the prosecution secured Pratt's admission before having an opportunity to present its case in chief. For these reasons, we disagree with the dissent, and give effect to the parties' stipulation.

17

**B.    The Courts Below Did Not Err In Utilizing A Balancing Test Or In Concluding That The Balancing Test In This Case Favors The State.**

The first question presented by Pratt's application requires the court to consider whether it was proper for the trial court and ICA to undertake a balancing test after Pratt satisfied the three-factor <u>Hanapi</u> test.[11]  We hold that it was, as explained below.

1.    <u>The Privilege For Native Hawaiian Practices Requires The Finder Of Fact To Balance Competing Interests.</u>

The privilege afforded for native Hawaiian practices, as expressed in our State constitution and statute, is not absolute.  The language of the provisions protecting customary native Hawaiian practices display a textual commitment to preserving the practices while remaining mindful of competing interests.  For example, the constitutional language protecting the right to traditional and customary practices is qualified by the phrase "subject to the right of the State to regulate such rights."  As a second example, HRS § 7-1, a statute protecting gathering rights, provides that native Hawaiians may gather traditional plants, but specifically exempts from protection the

---

[11]    Pratt also argues that the rule of lenity precludes conviction. The rule of lenity is a rule of statutory construction. <u>State v. Shimabukuro</u>, 100 Hawai‘i 324, 327, 60 P.3d, 274, 277 (2002) ("Where a criminal statute is ambiguous, it is to be interpreted according to the rule of lenity.").  Pratt does not argue that the regulation under which he was convicted is ambiguous, but rather that the constitutional privilege is ambiguous.  Pratt does not cite, and the court was unable to find, any authority for applying that rule of statutory interpretation to constitutional affirmative defenses.  The court therefore agrees with the conclusion of the trial court and ICA that the rule of lenity does not apply in Pratt's case.

18

gathering of these items for commercial purposes.

In our previous cases, this court has interpreted the constitutional and statutory language as requiring consideration of the facts and circumstances surrounding the conduct. Chief Justice Richardson explored this balance in <u>Kalipi v. Hawaiian Trust Co., Ltd.</u>, 66 Haw. 1, 656 P.2d 745 (1982). The plaintiff in that case, William Kalipi, owned a taro patch in the Manawai ahupuaʻa and an adjoining houselot in Ohia ahupuaʻa, on the island of Molokaʻi. <u>Kalipi</u>, 66 Haw. at 3, 656 P.2d at 747. He lived in a nearby ahupuaʻa called Keawenui. <u>Id.</u> For years, Kalipi and his family had entered Manawai and Ohia to gather ti leaf, bamboo, kukui nuts, kiawe, medicinal herbs, and ferns. <u>Id.</u> at 4, 656 P.2d at 747. When the Hawaiian Trust Company refused him the access to which he was accustomed, Kalipi brought suit alleging that he had a right to enter the property to gather the items as he wished. <u>Id.</u> Chief Justice Richardson's opinion acknowledged the tension between modern concepts of land ownership and native Hawaiian gathering rights. He explained that "any argument for the extinguishing of traditional rights based simply upon the possible inconsistency of purported native rights with our modern system of land tenure must fail." <u>Id.</u> at 4, 656 P.2d at 748. Similarly, the court implicitly recognized that the bare assertion of this privilege is inadequate to defeat all property rights. That is, the two conceptions of property must coexist somehow, and the court saw its task as:

19

> to conform these traditional rights born of a culture which knew little of the rigid exclusivity associated with the private ownership of land, with a modern system of land tenure in which the right of an owner to exclude is perceived to be an integral part of fee simple title.

Id. at 7, 656 P.2d at 749. The court in Kalipi "struck" a "balance" in its interpretation of HRS § 7-1, which at the time of the Kalipi opinion stated:

> Where the landlords have obtained, or may hereafter obtain, allodial titles to their lands, the people on each of their lands shall not be deprived of the right to take firewood, housetimber, aho cord, thatch, or ki leaf, from the land on which they live, for their own private use, but they shall not have a right to take such articles to sell for profit. The people shall also have a right to drinking water, and running water, and the right of way. The springs of water, running water, and roads shall be free to all, on all lands granted in fee simple; provided, that this shall not be applicable to wells and water-courses, which individuals have made for their own use.

Id., HRS § 7-1 (1976).[12] In construing this statute, the court articulated two standards: one for developed land, and one for undeveloped land. Id. at 8, 656 P.2d at 750. The court held that there is no right to exercise native Hawaiian practices on developed land because it "would so conflict with understandings of property, and potentially lead to such disruption, that we could not consider it anything short of absurd and therefore other than that which was intended by the statute's framers." Id. at 8-9, 656 P.2d at 750. Second, for undeveloped land, the court instructed that land use should be determined on a case by case basis, and that traditional rights "should in each case be

---

[12] The current version of the statute includes two small modifications: the word "housetimber" is now written as "house-timber," and the word "water-courses" is now written as "watercourses." HRS § 7-1 (2009).

20

determined by <u>balancing the respective interests and harm</u> once it is established that the application of the custom has continued in a particular area."  <u>Id.</u> at 10, 656 P.2d at 751 (emphasis added).  In Kalipi's case, the court did not proceed to the balancing test because it held that the statutory provisions he cited did not protect the rights of non-residents of an ahupuaʻa.  <u>Id.</u> at 9, 12, 656 P.2d at 750, 752.

Kalipi also cited HRS § 1-1 as a source of his right of entry.  At the time of Kalipi's case, that statute provided:

> The common law of England, as ascertained by English and American decisions, is declared to be the common law of the State of Hawaii in all cases, except as otherwise expressly provided by the Constitution or laws of the United States, or by the laws of the State, or fixed by Hawaiian judicial precedent, or established by Hawaiian usage. . . .

HRS § 1-1 (1955).[13]  The court determined that this provision sought to permit native Hawaiian practices "which did not unreasonably interfere with the spirit of the common law."  66 Haw. at 10, 656 P.2d at 751.  The court again held that the practice must be considered on a case by case basis.  This court has since read <u>Kalipi</u> as "merely informing us that the <u>balance of interests and harms</u> clearly favors a right of exclusion for private property owners as against persons pursuing non-traditional practices or exercising otherwise valid customary rights in an unreasonable manner."  <u>PASH</u>, 79 Hawaiʻi at 442, 903 P.2d at 1263 (emphasis added).

--------

[13]    This exact statute remains in effect.  HRS § 1-1 (1999).

21

Following <u>Kalipi</u>, the next main case to consider native Hawaiian rights was <u>Pele Defense Fund v. Paty</u> ("<u>PDF</u>"), 73 Haw. 578, 837 P.2d 1247 (1992). In that case, PDF, a non-profit corporation whose stated purpose is to perpetuate Hawaiian religion and culture, challenged the constitutionality of a land transfer in which the State traded public land, including the Wao Kele ʻO Puna Natural Area Reserve, in exchange for land that had been privately held. <u>Id.</u> at 584, 837 P.2d at 1253. PDF asserted, among other claims, that the transfer violated Article XII, § 7 of the State constitution because it denied access into Wao Kele ʻO Puna for PDF members who wished to exercise their traditional practices. <u>Id.</u> at 613, 837 P.2d at 1268. In analyzing this claim, this court first distinguished the residency requirement holding of <u>Kalipi</u> because Kalipi's claims had been based on a claim of ownership, while PDF's claims were constitutional and founded in custom. <u>Id.</u> at 618-19, 837 P.2d at 1271. After determining that the constitutional provision at issue was intended to protect "the broadest possible spectrum of native rights," the court held that it may protect rights that extend beyond the ahupuaʻa of residence because the purpose of Article XII, § 7 was to reaffirm "<u>all</u> rights customarily and traditionally held by ancient Hawaiians." <u>Id.</u> at 619-20, 837 P.2d at 1271-72 (emphasis in original). The court limited practices on others' ahupuaʻa to situations "where such rights have been customarily and traditionally exercised in this

22

manner." Id. at 620, 837 P.2d at 1272. The court remanded, and wrote that in addition to proving that the practice is traditional and customary, PDF must also show that it meets "the other requirements of Kalipi." Id. at 621, 837 P.2d at 1272.

In a subsequent case, PASH, this court identified the "other requirements" as referring to the requirements that the land be undeveloped and that the activity cause no actual harm. PASH, 79 Hawaiʻi 425, 439-40, 903 P.2d 1246, 1260-61. The question presented in PASH was whether Public Access Shoreline Hawaiʻi, a public interest organization, had standing to participate in a contested land use case hearing regarding a proposed development on the island of Hawaiʻi. Id. at 429, 903 P.2d at 1250. This court held that the group had standing to participate in such a hearing, and proceeded to articulate the constitutional analysis for the case on remand. Id. at 435, 903 P.2d at 1256. First, the court noted that the constitutional protection is not absolute; it only protects the "reasonable" exercise of native Hawaiian rights. Id. at 442, 903 P.2d at 1263. Then, the court pointed out that the constitution gives the State the "power to regulate the exercise of customarily and traditionally exercised Hawaiian rights," and that the same provision obligates the State to protect the exercise of those rights "to the extent feasible." Id. at 450 n.43, 903 P.2d at 1271 n.43.

A common thread tying all these cases together is an

23

attempt to balance the protections afforded to native Hawaiians in the State, while also considering countervailing interests. In the criminal context, one countervailing interest of particular importance, and explicitly stated in the constitutional provision, is "the right of the State to regulate such rights." In the first case examining the native Hawaiian privilege as a defense to a criminal conviction, State v. Hanapi, Alapai Hanapi was convicted of trespass after he entered his neighbor's land to observe the restoration of the Kihaloko and Waihilahila fishponds. 89 Hawai'i 177, 178, 970 P.2d 485, 486 (1998). Hanapi argued that his trespass was constitutionally protected because he went to the property to "perform our religious and traditional ceremonies of healing the land" and "to make sure that restoration was done properly." Id. at 181, 970 P.2d at 489. The court articulated the three-point test, holding that a criminal defendant asserting this privilege as a defense to criminal charges must, "at minimum", prove the following: (1) the defendant must be "native Hawaiian" according to the criteria established in PASH[14], (2) the claimed right must be "constitutionally protected as a customary or traditional native Hawaiian practice," and (3) the conduct must occur on undeveloped property. Id. at 185-86, 970 P.2d at 493-94. The court affirmed

---

[14]     PASH defines "native Hawaiians" as "descendants of native Hawaiians who inhabited the islands prior to 1778[.]" PASH, 79 Hawai'i 425, 449, 903 P.2d 1246, 1270 (1995).

Hanapi's conviction, holding that Hanapi did not satisfy his burden to prove that he was engaged in a traditional practice while on his neighbor's land.  Id. at 187, 970 P.2d at 495.

 2.    In Balancing Interests, The Court Must Consider The Totality Of The Circumstances.

All four of the Judges to consider Pratt's case have agreed that once a criminal defendant satisfies the three-prong showing required by Hanapi, there remains a balancing test before the defendant's assertion of the native Hawaiian privilege negates any possible criminal conviction.  They have, however, differed in their views of what factors the test should consider. The trial court reached the following conclusions of law in its articulation of the balancing test:

> [COL] 9.  Case and statutory law all suggest that even with such a showing (under Hanapi), the Court must "reconcile competing interests," or stated another way "accommodate competing...interests" and only uphold such rights and privileges "reasonably exercised" and "to the extent feasible" and "subject to the right of the State to regulate such rights."  See Article XII, section 7, Hawaii Constitution; Public Access Shoreline Hawaii v. Hawaii County Planning Commission, 79 Hawaii 425 (1995).

> [COL] 10.  The Court must balance the competing interests of Mr. Pratt's attempts to exercise certain Hawaiian native [sic] rights by setting up a residence and [heiau] in the Kalalau Valley with the State's interest in keeping this a wilderness area for all to enjoy and be safe in.

> [COL] 11.  The Court finds that the State has a valid interest in protecting and preserving this valuable asset, which means, among other things, controlling the amount of traffic, the length of stay for any one person, and the types of activities that are consistent with this stewardship.  This interest when balanced against the rights expounded by Mr. Pratt weigh in favor of the State.

Thus, it appears that the trial court considered the defendant's stated intention, balanced against the State's offered

legislative prerogatives.

At the ICA, Judge Leonard's opinion concluded that the balancing test in this case weighed in favor of the State, in part because there was no evidence that the State's regulation was unreasonable. Pratt at 356, 243 P.3d at 316. This articulation of the balancing test necessarily places a burden of proof on the defendant to show unreasonableness of the regulation. Judge Fujise likewise placed the burden of proof on the defendant, but articulated the test as requiring the defendant to show the reasonableness of his conduct under the circumstances. Id. at 357, 243 P.3d at 317. Chief Judge Nakamura contended that the State carries the burden of proof to show that the defendant's conduct resulted in actual harm. Id. at 363-64, 243 P.3d at 323-24.

We respectfully decline Chief Judge Nakamura's articulation of the test, finding the test to be too narrow. The facts of this case provide apt illustration. The harm against which the park's regulation seeks to protect is the harm caused by too many visitors in Kalalau Valley; by definition, one person could never cause that harm. But this does not mean that the government may not seek to protect against overuse. In fact, user permits are a common and effective government tool in situations where outlawing the threatening activity is not necessary, but where the government seeks to control against overuse of a limited resource.

26

We likewise reject the other ICA Judges' articulations of the test because of this court's practice of applying totality of the circumstances tests, as opposed to legal presumptions, in the context of native Hawaiian rights. For example, in Kalipi, the plaintiff asserted that HRS § 1-1 established certain native Hawaiian customary rights as the law of the State. Kalipi at 9, 656 P.2d at 750. In response, the defendants contended that any rights that may have been retained had been abrogated by an early case suggesting that HRS § 7-1 contained an exhaustive list of native Hawaiian rights, and that all other customary practices could be freely regulated by the State. Id. Finding the plaintiff's contention too broad and the defendants' too narrow, this court rejected both views, stating, "[r]ather, we believe that the retention of a Hawaiian tradition should in each case be determined by balancing the respective interests and harm once it is established that the application of the custom has continued in a particular area." Id. at 10, 656 P.2d at 751 (emphasis added). This court has since interpreted Kalipi as "informing us that the balance of interests and harms clearly favors a right of exclusion for private property owners as against persons pursuing non-traditional practices or exercising otherwise valid customary rights in an unreasonable manner." PASH, 79 Hawaiʻi at 442, 903 P.2d at 1263.

Likewise, in PDF, the court acknowledged the balancing requirement implicit in the constitutional language, writing that

27

the provision both "reaffirm[ed] customarily and traditionally exercised rights of native Hawaiians, <u>while giving the State the power to regulate these rights</u>."  <u>PDF</u> at 619, 837 P.2d at 1271 (emphasis added).  Then, after determining that non-residence was not a bar to plaintiffs' claims of a native Hawaiian right, the court wrote,

> If it can be shown that Wao Kele ʻO Puna was a traditional gathering area utilized by the tenants of the abutting ahupuaʻa, and that the other requirements of <u>Kalipi</u> are met in this case, then PDF members such as Ms. Naeole <u>may</u> have a right to enter the undeveloped areas of the exchanged lands to exercise their traditional practices.

<u>Id.</u> at 621, 837 P.2d at 1272 (emphasis added).  In using the word "may"—as opposed to "must"—the court left room for the courts to implement the constitutional language by considering all the circumstances of the case on remand.

The importance of considering the totality of circumstances is also reflected in this court's discussion of developed and undeveloped lands in <u>Hanapi</u>.  There, the court reiterated <u>PASH</u>'s holding that it is "<u>always</u> 'inconsistent' to permit the practice of traditional and customary native Hawaiian rights on such [developed] property.  In accordance with <u>PASH</u>, however, we reserve the question as to the status of native Hawaiian rights on property that is 'less than fully developed.'" <u>Hanapi</u> at 187, 970 P.2d at 495 (quoting <u>PASH</u> at 450, 903 P.2d at 1271).  The court refused to validate a bright-line test whereby native Hawaiian practices on undeveloped lands are always permitted.

28

The dissent argues against utilizing a totality of the circumstances test in this context, in part because "settled criteria" already exist. Dissent at 30. It further argues that a totality of the circumstances test is "imprecise" and "invites consideration of matters beyond the benchmarks." Dissent at 30. We disagree with each of these points. First, as explained above, we read the cases cited in this opinion as underscoring the importance of the court's careful judgment in resolving cases involving traditional and customary native Hawaiian rights; we do not read them as providing a limited set of "settled criteria" to evaluate in every case. Second, we do not share the dissent's concerns that the court should avoid utilizing a totality of the circumstances test because it is "imprecise." Rather, we note that it is the very flexibility ensured by this test that makes it appropriate to use in this context. Review of this jurisdiction's cases involving native Hawaiian practices shows how varied the scenarios are in which native Hawaiian rights arise. Because the constitutional provision at issue applies in several contexts, and because we cannot anticipate which factors may be relevant in all contexts, we decline to articulate a test that could preclude consideration of important factors.

In applying the totality of the circumstances test to the facts of this case, the balancing of interests weighs in favor of permitting the park to regulate Pratt's activity, his argument of privilege notwithstanding.

Souza testified that the regulation serves several important purposes. The DLNR manages the park so "people can have a wilderness type of experience." He described the Kalalau Valley as "one of the most scenic areas," and noted that it is "rich in cultural resources," including native plant communities and native sea birds. He testified that the DLNR requires visitors to obtain permits in an effort to limit visitors for health and safety reasons, and to protect park resources. One concern is that the self-composting toilets fail when they are overused, another is that they must keep the area "low density" to protect the fragile ecosystem.

The record also shows that Pratt has an interest in going to Kalalau Valley. As the ICA wrote, "Pratt clearly cares for and feels a spiritual connection to Kalalau and the ancient Hawaiians that once occupied the valley." Pratt at 311, 243 P.3d at 351. Pratt is a kahu; he has studied native Hawaiian practices and goes to the valley as part of his practice.

However, according to his testimony, his actions in Kalalau Valley go beyond stewardship. Pratt testified that he took care of some of the heiau, but also that he established a residence in Kalalau Valley, and cleared entire areas of the valley in order to replant them with other species. He undertook this work without consultation with the DLNR, and without an effort to comply with the DLNR's permit requirements. Aside from an unsuccessful application to work with the DLNR in the 1990s,

30

Pratt did not show any attempts to engage in his native Hawaiian practice within the limits of state law.

In this case, the trial court did not err in considering all of the facts and circumstances surrounding Pratt's activities, and then balancing the parties' interests. While Pratt has a strong interest in visiting Kalalau Valley, he did not attempt to visit in accordance with the laws of the State.  Those laws serve important purposes, including maintaining the park for public use and preserving the environment of the park.  The outcome of this case should not be seen as preventing Pratt from going to the Kalalau Valley; Pratt may go and stay overnight whenever he obtains the proper permit. He may also apply to the curatorship program to work together with the DLNR to take care of the heiau in the Kalalau Valley. The trial court did not err in determining that Pratt's interest in conducting his activities without a permit did not outweigh the State's interest in limiting the number of visitors to Kalalau Valley; Pratt's activities, therefore, do not fall under constitutional protection.

As always in a criminal case, the prosecution bears the burden of proving the defendant guilty of the charged offense. In this case, Pratt admitted to violating the regulation at issue: he stipulated that he was in a closed area of Kalalau State Park on the three dates of his citations.  Therefore, this

court must affirm Pratt's convictions for violating HAR § 13-146-4.

## IV.   CONCLUSION

As explained above, we affirm the December 17, 2010 Judgment of the ICA, which affirmed the District Court of the Fifth Circuit's June 16, 2006 Judgments convicting Pratt of violating HAR § 13-146-4.

| | |
|---|---|
| Daniel G. Hempey for petitioner/ defendant-appellant | /s/ Mark E. Recktenwald |
| | /s/ Paula A. Nakayama |
| Tracy Murakami and Jake Delaplane, Deputy Prosecuting Attorneys, for respondent/plaintiff-appellee | /s/ James E. Duffy, Jr. |
| David Kimo Frankel and Ashley K. Obrey of the Native Hawaiian Legal Corporation for amicus curiae Native Hawaiian Legal Corporation | |

